**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION**


**MICHAEL P. JOHNSON,**

   **Petitioner,**     **CASE NO. 2:17-CV-0121**

            **JUDGE MICHAEL H. WATSON**
            **Magistrate Judge Jolson**

**WARDEN, ROSS CORRECTIONAL
INSTITUTION,**

   **Respondent.**


## REPORT AND RECOMMENDATION and ORDER

   Petitioner, a state prisoner, brings this petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254. This matter is before the Court on the Petition, Respondent's Return of Writ, Petitioner's Reply, and the exhibits of the parties including the supplemental documents submitted by Petitioner. For the reasons that follow, the Magistrate Judge **RECOMMENDS** that the petition be **DENIED** and this action be **DISMISSED**.

**I.  FACTS AND PROCEDURAL HISTORY**

   **A. Facts, Trial, and Conviction**

   The Ohio Tenth District Court of Appeals summarized the facts and procedural history of this case as follows:

> On August 9, 2012, appellant and more than 40 other co-defendants were charged in a 95–count indictment in common pleas case No. 12CR–3961. Under the indictment, appellant was charged with one count of engaging in a pattern of corrupt activity, in violation of R.C. 2923.32, and 19 counts of aggravated funding of drug trafficking, in violation of R.C. 2925.05. On October 16, 2013, appellant was indicted in common pleas case No. 13CR–5503 on 8 counts of aggravated funding of drug trafficking, in violation of R.C. 2925.05. The two cases were consolidated for trial.

On August 14, 2012, attorney Javier Armengau entered an appearance on behalf of appellant. On August 24, 2012, plaintiff-appellee, State of Ohio, filed a motion to disqualify counsel on conflict of interest grounds, arguing that Armengau had previously represented a confidential informant utilized by law enforcement personnel during the course of the investigation in the instant actions. On September 20, 2012, appellant filed a memorandum contra the state's motion to disqualify counsel. The parties subsequently submitted affidavits to the trial court under seal regarding the anticipated testimony of the confidential informant (hereafter "the CI"). The trial court, by entry filed November 19, 2012, granted the state's motion to disqualify counsel. Appellant filed an interlocutory appeal with this court from the trial court's entry granting the motion to disqualify. In *State v. Johnson*, 10th Dist. No. 12AP–1067, 2013-Ohio-1682, 2013 WL 1791065, this court affirmed the trial court's decision.

The matter came for trial before a jury on October 22, 2013. Columbus Police Detective David M. Allen is a member of the department's tactical division squad, with prior experience investigating pill trafficking rings. Detective Allen testified that such rings typically involve a "three-tiered organization," in which two or three individuals at the top tier act as "organizers" who "fund the money, fund the trips." (Tr. 19.) The organizers supply transportation money, as well as pay for the prescriptions. The detective identified the second tier as comprised of "lieutenants," or persons that the head of an organization "will trust with the money." (Tr. 19–20.) These individuals are also trusted to "collect all the pills once they've been filled at a pharmacy." (Tr. 21.) The final tier of the organization is composed of the individuals who obtain and fill prescriptions, identified by the detective as "abusers"; they tend to be "older," and may have injuries that are somewhat legitimate or "on the fringe." (Tr. 21.)

Detective Allen identified the most valuable drug on the street as 30 milligram Oxycodone pills. Other valuable drugs include 15 milligram Oxycodone pills and Xanax pills, and all of these medications are "highly addictive." (Tr. 22.) According to the detective, Florida is "the hot bed where most of these pills are coming out of." (Tr. 25.)

Detective Allen participated in the investigation leading to the arrest of appellant. During the course of that investigation, detectives conducted surveillance of "multiple individuals" they believed were involved in a pill trafficking operation. (Tr. 27.) The surveillance included monitoring the location of suspects through the use of "[p]ings on cell phones." (Tr. 29.) Among the individuals targeted were Eric MacDonald, Robert Muncy, Richard Muncy, Frances Smith, and Stephanie Kelley. Detectives also conducted surveillance of a business, Creative Tattoos, located on South High Street.

On December 29, 2011, detectives received information that Kelley, Smith, Richard, and Robert were arriving at Port Columbus International Airport on a flight from Ft. Lauderdale, Florida. Investigators observed the four individuals

leave the Columbus airport in a vehicle and travel to Shelly Avenue, stopping at the residence of Smith and Robert. Richard and Kelley then drove to Kelley's residence on Lewis Avenue; later, Richard drove a Plymouth Neon to appellant's residence, located at 1075 Lavender Lane. Detective Allen observed Richard standing with appellant "in the garage." (Tr. 34.) Richard then departed appellant's residence in a different vehicle, a red Ford Taurus, returning to Kelley's residence.

The next day, these same four individuals drove to Fairfax, Virginia. According to the detective, "they were visiting pharmacies based on the ping chart." (Tr. 36.) Pharmacy records indicated that Richard, Kelley, and Smith filled prescriptions at a Virginia CVS pharmacy on December 30, 2011. Robert and Smith returned to the Fairfax, Virginia area on January 6, 2012. Detectives in Virginia learned that these individuals "visited pharmacies and * * * filled prescriptions that were out of Florida." (Tr. 37.)

On January 26 and 27, 2012, these four individuals took a round-trip flight from Columbus to Ft. Lauderdale, Florida. Law enforcement officials in Florida followed them to the All Family Medical Center, located in North Ft. Lauderdale. Upon returning to Columbus, they then traveled to Fairfax, Virginia, visiting various pharmacies. At trial, the state introduced copies of prescription records from those pharmacies, including prescriptions for Roxicodone filled in the names of Richard Muncy and Frances Smith.

During the investigation, detectives obtained statements by Robert Sparks and MacDonald explaining the structure of the organization. Sparks and MacDonald also provided the investigators with names of other individuals. Detective Allen testified that police surveillance and pharmacy records corroborated information provided by Sparks and MacDonald.

On February 24, 2012, at 11:20 p.m., Columbus Police Detective Brian Key and other law enforcement officers executed a search warrant for appellant's residence on Lavender Lane. At trial, the state introduced photographs taken of the house at the time of the search. One of the photographs depicted $100 bills, wrapped with a rubber band, found in a drawer located in the master bedroom. Police officers recovered a total of $3,580 cash from the residence, as well as empty pill bottles and bottles containing pills. The officers found a receipt for the purchase of a "multifunction portable sweep." (Tr. 132.) According to Detective Key, the device is used to determine whether a vehicle has "been GPS'd." (Tr. 133.) The officers also located a letter bearing MacDonald's name, and a Budget car rental agreement in the name of Nancy Salyers.

Detective Key identified other exhibits, including a receipt for a Florida hotel room in the name of Todd Salyers, appellant's nephew, reflecting a cash payment in the amount of $415.39, and bond paperwork for Todd from Manassas Park, Virginia. The officers found labels from pill bottles for Oxycodone in 30

milligram doses in the name of Todd, as well as pharmacy receipts for Todd from Florida pharmacies indicating cash purchases.

During the search of appellant's residence, officers located business ledgers for Creative Tattoos listing appellant as the owner. At trial, the parties stipulated that appellant and Todd "were directly involved and ran the day-to-day operations of Creative Tattoos on South High Street." (Tr. 159.) The parties further stipulated that Vickie Johnson "was the named owner and was aware of said operations." (Tr. 159–60.)

Robert, age 37, is married to Smith; Robert has been an acquaintance and friend of appellant since grade school. In 2012, appellant approached Robert about making trips to Florida "to obtain prescriptions." (Tr. 164.) Appellant and Robert reached an agreement for appellant to pay the costs of transportation, hotel, food, physician office calls, and MRIs pertaining to Robert's Florida trips. The purpose of obtaining an MRI, costing approximately $300, was to "receive medication from pain management." (Tr. 165.) On a typical visit, a physician would prescribe for Robert between 160 to 210 Oxycodone 30 milligram pills. Robert also received prescriptions for Oxycodone 15 milligram pills, as well as Xanax and Soma pills. Robert paid cash for the office calls and prescriptions; the cost of each office call was between $300 to $350.

Robert subsequently obtained Florida identification, allowing for a "[c]heaper office call, easier to fill them in there." (Tr. 169.) Robert would usually travel to Florida with four to six other individuals. MacDonald would "carry the money," passing it out to other individuals to cover expenses. (Tr. 169.) The cost per person to obtain prescriptions from clinics and physicians in Florida was "[a]pproximately 1,500 to $2,000 round trip." (Tr. 166.) After obtaining prescriptions, Robert and the others would check local phone books to find pharmacies in the area, or "doctors would give you lists of pharmacies in the Florida area or the county." (Tr. 170.) During the trip back to Columbus, MacDonald gathered all of the Oxycodone "30s," and the other individuals "kept everything else" in return for acquiring the prescriptions. (Tr. 172.)

In 2010, the pharmacy price for Oxycodone 30 milligrams was approximately $2 per pill, while the street value was $20 per pill. In 2012, the pharmacy price of Oxycodone 30 milligrams was between $3 and $4 per pill, while the street value was between $25 and $30 per pill. Robert and the others eventually looked to other states, including Virginia, to fill the prescriptions at cheaper prices.

On his first trip to Florida, Robert traveled with his brother, Richard, along with MacDonald and Dalton Chapman, an acquaintance of appellant. Robert testified that appellant provided the money for that trip, and they traveled in a blue Chevy Suburban driven by Chapman; MacDonald carried the cash for everyone on the trip. After obtaining the prescriptions and returning to Columbus, Robert and the others drove to Creative Tattoos on South High Street. MacDonald collected the

Oxycodone 30 milligram pills from each of the men; Robert was permitted to keep the remaining prescription drugs he had obtained as his payment.

According to Robert, subsequent trips were financed in the same manner. Robert described one trip in which he arrived at Creative Tattoos prior to leaving for Virginia. Appellant had a vehicle waiting for Robert at the tattoo shop; underneath the floor mat, Robert found car keys as well as $1,600 in cash, wrapped in a rubber band. Robert and his wife traveled to Virginia, where Robert filled the prescriptions. Upon returning, Robert parked the vehicle in front of the tattoo shop, leaving the prescriptions underneath the front seat for appellant.

On three to five occasions, Robert and his brother, Richard, drove to appellant's residence on Lavender Lane to deliver approximately 600 to 800 Oxycodone 30 milligram pills to appellant. The men would enter appellant's residence through the garage. Robert also observed other individuals turn Oxycodone pills over to Richard to deliver to appellant.

Later, Robert and others began taking flights to Florida instead of driving. Upon returning from Florida, Robert would drive to Virginia to fill the prescriptions and then deliver the Oxycodone 30 milligram pills to appellant. Robert sold some of the other prescriptions he obtained from Virginia. Robert testified that he was addicted to pain medication and, on approximately three to five occasions, he purchased Oxycodone 30 milligram pills back from appellant at the tattoo shop.

On February 24, 2012, law enforcement officers executed a number of search warrants in Franklin County. Robert subsequently signed a proffer letter and spoke with prosecutors and detectives about his knowledge of the organization, entering into an agreement with the state to testify. He later entered a guilty plea to one count of engaging in a pattern of corrupt activity, and eight counts of aggravated trafficking in drugs.

At trial, the state introduced patient history forms listing the names of patients, their prescribing physicians, the prescriptions obtained, and the particular pharmacy where a prescription was filled. Robert testified as to approximately 12 patient visits he made during trips to Florida from September 2010 to July 2011. Other individuals listed on the patient history forms included MacDonald, Richard, and Terry Maxwell.

On direct examination, MacDonald admitted to several prior convictions, including for drug trafficking, and he also acknowledged being addicted to prescription drugs. In September 2009, appellant and Chapman contacted MacDonald to ask him if he would be interested in making money traveling to Florida to obtain pills. MacDonald agreed and, over the next two years, he made approximately 80 to 100 trips to Florida, traveling with various other individuals including Richard, Robert, Maxwell, Mark Keller, Kelley, Christine Perry, Benjamin Cline and Christopher Jordan.

On a typical trip, MacDonald would visit a doctor, "hand over a couple hundred bucks. They give you a paper, tells you where to go to get the MRI. You go get the MRI. You go back to the doctor. You sit and wait. And you see the doctor * * * and they give you the script." (Tr. 259.)

On MacDonald's first trip to Florida, Chapman paid him $800. MacDonald obtained money for subsequent trips from appellant at appellant's residence. MacDonald would "get with [appellant], and we would figure out who you would take down." (Tr. 262.) According to MacDonald, "[i]t was [appellant's] payment, but I would arrange it." (Tr. 264.) MacDonald and the others would obtain Oxycodone, Xanax, and Soma pills. The individuals who went on the trips could either receive money or pills as payment, but they were required to turn over the Oxycodone 30 milligram pills. The amount of money MacDonald received from appellant depended upon the number of individuals making the trip. Appellant would provide MacDonald with "$2,000 per person." (Tr. 264.) During these trips, appellant would "call and check * * * and see what's going on, ask me what's going on through the trip." (Tr. 265.)

Appellant told MacDonald to provide Sparks "any information that he needed for down there, like doctors, any phone numbers, addresses, * * * anything like that." (Tr. 266.) MacDonald also received money from appellant to rent vehicles for the trips to Florida. Upon returning to Columbus from Florida, MacDonald would phone appellant, "let him know I was back. So I would have to collect everybody's 30s, which was payment for the money, and drop everyone off and then drop them off to him." (Tr. 270.) MacDonald took the pills to appellant's house, meeting appellant in the garage. MacDonald eventually began filling prescriptions in Virginia because it was "a lot cheaper than Florida." (Tr. 271.)

MacDonald testified that he took trips to Florida to obtain prescriptions on the following dates: June 7, July 2, August 6, September 2, September 9, September 30, November 9–12, December 8, 2010, January 18–20, February 2, February 18–23, February 24–March 3, March 16–18, March 26–31, April 13–19, April 27–29, May 9–13, June 6–8, June 10, June 30–July 2, July 7–8, August 12, and September 9, 2011. According to MacDonald, appellant gave him money for all of the above trips, and MacDonald delivered pills back to appellant.

On September 10, 2011, police officers in Virginia arrested MacDonald, as well as Perry, Maxwell, Keller, and Kelley. The next day, MacDonald attempted to contact appellant for assistance. MacDonald later entered into a guilty plea to one count of engaging in a pattern of corrupt activity and three counts of attempted aggravated trafficking in drugs.

During 2009 and 2010, Carter Moore was a frequent visitor to Creative Tattoos. Carter observed appellant and Eric Sullivan "talk a lot and sometimes switch money" between them. (Tr. 339.) Appellant informed Carter that he made money

from other individuals and from prescription drugs. On one occasion, appellant asked Carter if he "wanted to go out of town and make some money." (Tr. 339.) Appellant offered him money for the trip, but Carter declined because he was employed at the time. Carter subsequently entered a guilty plea to one count of aggravated trafficking in drugs.

Stephen Anderson, age 32, first met appellant in 2010. At that time, appellant "started funding a little activity for me down in Florida." (Tr. 359.) Anderson also began working at a construction company, Nitro Restoration, run by appellant and Sullivan. Anderson took trips to Florida for appellant; on those trips, Anderson would "go down there and get what we had to get and bring it back and give him what was supposed to go to him and keep what was supposed to go to me." (Tr. 360.) Anderson was permitted to keep "all the 15s and all the Xanax and they got all the 30s." (Tr. 361.)

Appellant and Sullivan were involved in coordinating the trips to Florida during this time. The total cost of a trip for five individuals was between $8,000 to $10,000. On one trip, Sullivan told Anderson that appellant wanted Anderson to teach appellant's nephew how to obtain prescription drugs in Florida. Appellant funded Anderson's trips to Florida through Sullivan, who acted as a middleman. Appellant paid for rental cars for some of the trips to Florida. Upon returning from Florida, Anderson would collect the pills. Anderson "usually kept the Xanaxes" for himself, and he turned over the remainder of the pills to Sullivan and appellant. (Tr. 372.)

On several occasions, Anderson had conversations with appellant about obtaining money for trips. Anderson spent time in prison from December 2010 until July 2011. Sullivan funded some trips in 2010, but appellant funded all the trips after Anderson's release from prison in 2011. Anderson stopped making trips in 2012 because of police activity. Anderson testified that he made trips funded by appellant "pretty much at least once every month" beginning in August 2010 and ending in January 2012. (Tr. 385.) Anderson subsequently entered a guilty plea to one count of engaging in a pattern of corrupt activity, and five counts of aggravated trafficking in drugs.

Maxwell has known appellant for 25 years. Appellant "fronted" Maxwell some Oxycodone, 30 milligrams, to resell and "make some money." (Tr. 399.) In spring 2010, appellant approached Maxwell about taking trips to Florida to obtain prescription drugs. Appellant offered Maxwell $500 to make the trip. Appellant informed Maxwell that he would be "going down with another person that I knew who had it all set up as far as what doctors we were going to. He had to go down and get a MRI then go from there to * * * see the doctor. The doctor really didn't care if there was anything wrong." (Tr. 400.) Appellant further explained to Maxwell that, after the physician wrote the prescription, "[w]e'd go from there to whatever pharmacy was available, normally whichever one was cheapest, and get the prescriptions filled and then head back to Columbus." (Tr. 403.)

Maxwell made his first trip to Florida in summer 2010 after he "got behind with some money I owed [appellant]." (Tr. 400.) On that trip, Maxwell traveled with MacDonald, Perry, Anderson, and a woman named Kara. Before departing, they met at Creative Tattoos; they "[w]ent in, got the money" from appellant "[w]rapped in a rubber band." (Tr. 402.) Each individual received $2,000, but MacDonald held the money for everyone but Maxwell. On that first trip, Maxwell was unable to obtain drugs because he "tested positive for cocaine." (Tr. 404.) Upon returning to Columbus with no pills, appellant told Maxwell he would have to return to Florida and "make it up." (Tr. 405.)

Maxwell participated in "[f]our or five" trips to Florida in 2010. (Tr. 406.) Appellant paid for each of those trips, and Maxwell would go to Creative Tattoos to obtain money prior to leaving. Upon returning from Florida, Maxwell gave the pills to appellant at the tattoo shop. Maxwell took trips with MacDonald, Perry, Richard, Cline, Jordan, Keller, Kelley, and Anderson. On the trips he made with MacDonald, "Eric would hold the majority of the money." (Tr. 407.) Maxwell, however, "had a good enough relationship with [appellant] where he trusted me with the money. But he would hold everybody else's money and regulate what was going on." (Tr. 407.) On the return trip from Florida, MacDonald "would gather everybody's pills up * * * around the outskirts of Columbus. As we're getting close to home he'd get everything together. Then we'd drop everybody off and meet up with [appellant]." (Tr. 408.)

Maxwell later made trips without MacDonald. On those occasions, Maxwell would "get in touch with [appellant], get the money. And then I paid another individual to drive me down. And I would just pay out of money that I received. I'd pay that fella the gas money, hotel, the food." (Tr. 407.) On trips he made without MacDonald, Maxwell would collect the pills from the other individuals "and then I delivered them myself once we got to Columbus." (Tr. 409.) Maxwell sometimes delivered pills to appellant's residence and, on other occasions, he accompanied MacDonald to appellant's house to deliver pills. Maxwell went to appellant's residence "at least 10" times, and to the tattoo shop "[a]t least five" times to deliver pills. (Tr. 409.) When Maxwell handed over the pills, appellant would "count them out; make sure the pill count was right." (Tr. 410.) On one occasion, appellant told Maxwell he was sending pills "down to West Virginia to get sold" through "one of his friends," Sullivan. (Tr. 410.) Appellant financed trips that Maxwell and others made to Florida on September 9, December 2–3, 2010, February 2, March 1–3, March 29–31, and August 15, 2011.

Sparks, age 37, met appellant in 2001 and they became friends. Sparks served five years in prison for a felony conviction for possession of drugs, and he was released on July 28, 2010. After his release, Sparks began traveling out of state to obtain prescription drugs. Sparks was involved in obtaining and selling prescription drugs from June 2011 to February 2012. The CI financed these early trips in which they would obtain Oxycodone 15 and 30 milligram pills. Sparks

also "borrowed money from [appellant], and I did use it to go down [to Florida]." (Tr. 456.) Sparks spoke with appellant about making trips to Florida. Appellant advised Sparks to speak with MacDonald regarding how to obtain drugs in Florida. MacDonald provided Sparks with detailed information about traveling to Florida to obtain prescriptions. While in Florida, Sparks sometimes had difficulty obtaining prescriptions; on those occasions, he would contact "several people," including MacDonald and Robert Ruben. (Tr. 460.) Sparks once loaned appellant his red Ford Taurus; appellant told Sparks "they did go to Virginia" in the vehicle. (Tr. 464.) At one point, appellant expressed concern to Sparks about police surveillance. A friend of Sparks had been "pulled over with some prescription pills as they were leaving the tattoo shop." (Tr. 463.)

Sparks purchased prescription pain medication from appellant from June through December 2011. Sparks recalled purchasing 360 "Percocet" pills from appellant on one occasion, and approximately 100 Percocet pills on another. (Tr. 465.) Sparks made one of these purchases at appellant's residence, while he made the other purchase at Creative Tattoos. Sparks spoke with appellant about taking Smith to Florida for a doctor's appointment, and appellant loaned Sparks $2,500 for the trip. Smith obtained the pills and turned them over to Sparks, and Sparks then "sold them." (Tr. 468.)

Sparks subsequently entered into an agreement with the state to testify in exchange for a recommended eight-year prison sentence. Sparks further agreed to enter a guilty plea to one count of engaging in a pattern of corrupt activity, one count of aggravated trafficking in drugs, and one count of aggravated funding of drug trafficking.

Jason Moore has known appellant for approximately 35 years. MacDonald approached Jason about taking trips to Florida, and Jason made three trips to that state for prescription medications. His first trip was in June 2010, and he traveled with MacDonald, Richard, and Anderson. MacDonald held all the money during that trip. Upon returning from Florida, Jason gave MacDonald all the Oxycodone 30 milligram pills, as well as the "Xanax and Somas." (Tr. 477–78.) After dropping Anderson off at a location on High Street, they drove to Creative Tattoos. According to Jason, this was "the first time that I even knew that [appellant] had anything to do with it. And we walked in. Me, him, Eric and Richie was in the back room. And Eric gave [appellant] the pills. And he returned, gave them money." (Tr. 478.) Appellant gave MacDonald money "rubber band rolled." (Tr. 479.)

Jason made a second trip in August 2010 with MacDonald, "Eric, Richie, [and] a guy named Ben." (Tr. 479.) MacDonald again held the money during the trip. On one trip, appellant provided a van for transportation. Jason made a third trip to obtain prescription pills in October 2010 with MacDonald, Mike Couch and Moore's fiancée, Patricia Wilson. On the return trip, the vehicle was involved in an accident resulting in Wilson's death. Appellant subsequently drove to Jason's

residence and asked Jason to speak with a private investigator. Appellant called the investigator on his phone and handed the phone to Jason. Jason lied to the investigator, telling him "I didn't know what he was talking about." (Tr. 484.)

Smith, age 39, is married to Robert, and she has known appellant since the eighth grade. In 2009, appellant approached Robert about taking trips to Florida; shortly thereafter, Robert began traveling there to obtain prescription drugs. Robert would return from these trips with "the 180 30s, and like 160 15s, 90 Xanaxes and 90 or 60 somas." (Tr. 502.) In late 2009 and early 2010, Robert was traveling to Florida "[o]nce a month," making trips with Richard and Kelley. (Tr. 502.)

Beginning in July 2010, Smith went on trips to Florida after "Robert said that we could make more money and get more pills." (Tr. 504.) They initially traveled in Smith's vehicle or Kelley's truck, and appellant provided the money for the trips. Smith traveled once a month, obtaining "160 30s, 120 15s, and 90 Xanaxes and 60 Somas." (Tr. 505.) Richard held the money for the trips. On the return trip to Ohio, Robert and Richard would "take the 30s." (Tr. 505–06.)

Before leaving on trips, Richard would obtain approximately $2,000 for each individual's expenses. In 2011, Smith and Robert were involved in a "big fight and split up," and Smith began taking trips with Sparks instead. (Tr. 508.) Later, from November 2011 until February 24, 2012, Smith again went on trips with "Robert, Richie and." (Tr. 509.) During this time, they were making trips once a month. These same individuals subsequently began flying to Florida. Upon returning to Ohio, "we would * * * then go and drive to Virginia and we'd fill the prescription[s] there and drive back." (Tr. 509.) They traveled to Virginia to fill the prescriptions because "[t]hey were cheaper." (Tr. 511.) The Oxycodone 30 milligram pills "would go to [appellant]." (Tr. 512.) Smith acknowledged her own personal use of the prescription drugs; of the pills Smith was able to keep from the trips, she would either take the pills or sell them. Smith paid cash for the prescriptions she obtained. On February 24, 2012, while returning from a trip to Virginia to fill prescriptions, law enforcement officials stopped their vehicle in Virginia.

Richard testified that his brother, Robert, informed him that appellant wanted him to go to Florida for doctor appointments. Richard had injured his back, and was using prescription pain medication at that time. In 2009, Richard took his first trip to Florida with his brother Robert, along with MacDonald, and Chapman. On that trip, Chapman carried the money for all of the individuals. In return for making the trips, Richard initially received money and some pills, including 15 milligram Oxycodone pills; later, he received just pills. Richard gave the Oxycodone 30 milligram pills to appellant.

On the initial Florida trips, MacDonald drove and also held the money. In 2010, Richard traveled to Florida approximately once a month. Prior to leaving, MacDonald would obtain the money from appellant. Richard sometimes

accompanied MacDonald to pick up money from appellant; it would be "wrapped with a rubber band," with an "individual certain amount for each person." (Tr. 536.)

Near the end of 2011, MacDonald no longer accompanied him, and Richard began carrying the money himself. Richard would meet appellant at "[e]ither the tattoo shop [or] his home." (Tr. 537–38.) Richard would sometimes meet appellant in the garage of appellant's residence to pick up money or to drop off pills. On other occasions, appellant came to Kelley's residence on Lewis Road, where Richard was staying, to drop off money. Sullivan, a friend of appellant, was sometimes present when Richard received money from appellant prior to a trip.

Richard testified that physicians scheduled appointments for the individuals "[e]very 28 days." (Tr. 542.) Prior to the trips, Richard would speak with appellant about "when we going to meet, get everything straightened around, get the money together and stuff; discuss how many people was going, who was going." (Tr. 542.) Richard would drive, and he would pick up the other individuals after obtaining the trip money because appellant "didn't want nobody around." (Tr. 543.)

On the early trips, they could obtain 240 of the Oxycodone 30 milligram pills at one time, but later "they started reducing the amount of pills they wanted to give you. So at the end I believe we was getting like 180 of each." (Tr. 539.) Richard and others began traveling to Virginia to fill the prescriptions.

On most of the trips appellant "was providing the vehicle." (Tr. 545.) Appellant "bought a couple minivans, was letting us use them." (Tr. 545.) Later, Richard borrowed a van from Kelley. When they flew to Florida, appellant would give Richard a "prepaid debit card and put money on it" to pay for the airline tickets. (Tr. 546.) Richard utilized the Internet to purchase the tickets. After Richard purchased the airline tickets, "we'd wait until ready to go, like the day before, meet with [appellant], get the money for us to go pay for the trips and then we'd go." (Tr. 547.) After flying back to Columbus, Richard would "go meet with [appellant], get the rest of the money to go to Virginia to pay for the prescriptions. I'd go get the money for them to go to Virginia, fill, and then come back." (Tr. 548.) Richard would also "take all the 30 milligrams from everybody and put them in one bag, and then I'd take them to [appellant]." (Tr. 549.) Appellant would "be in the garage waiting on me." (Tr. 549–50.) Appellant permitted Richard to use a red Ford Taurus on one of the trips to obtain prescriptions.

Perry dated MacDonald for 14 years until their relationship ended in September 2011. MacDonald approached Perry about traveling to Florida to obtain prescription paid medication, including Oxycodone. Perry made her first trip to Florida in 2011, and then made trips at least "[o]nce a month." (Tr. 582.) MacDonald told Perry that he obtained money for the trips from appellant. Prior

to leaving for Florida, MacDonald would go to Creative Tattoos. Perry once obtained money from appellant to bail out MacDonald. In September 2011, law enforcement officials in Virginia arrested Perry.

The CI has known Sparks since 2000, and the CI acknowledged "selling marijuana to him." (Tr. 611.) The CI met appellant in 2010 through Sparks. In summer 2011, the CI observed Sparks leaving on trips to Florida. The CI learned that "the people that rode along with the trips were the actual ones going to the doctor to get the pills and then being compensated for their travel, and the person funding was the individual providing the money." (Tr. 617.) The CI also observed Sparks purchase airline tickets. In July 2011, Sparks asked the CI to dispose of some "[e]mpty and some full pill bottles." (Tr. 620.) Sparks asked him to do this because "I could put them in a dumpster that I would be renting." (Tr. 620.) The CI, acting as a federal informant, provided an IRS agent with information that "Sparks had his people that he was sending, Ruben Rhodes had his group of people, and Mr. Johnson had his group of people, according to Robert." (Tr. 634.)

Columbus Police Detective Jeremy Ehrenborg testified that he had been involved in "three pill investigations" involving "multiple defendants that were traveling from Columbus, Ohio, to Florida to pick up prescription pills." (Tr. 677.) In each investigation, there was usually one individual who "funded the people who were traveling to get pills." (Tr. 677.) The individuals traveling to obtain the pills "generally didn't have the money to buy the prescriptions or pay for all the travel, the food and stuff like that." (Tr. 678.)

In November 2011, MacDonald contacted Detective Ehrenborg and told the detective he "had some information that he wanted to provide." (Tr. 690.) Detective Ehrenborg subsequently spoke with MacDonald regarding "his own activity" and "how the organization * * * ran." (Tr. 691.) Law enforcement officials obtained search warrants to activate GPS tracking on cell phones and vehicles, and a GPS unit was placed on Sullivan's GMC Yukon, as well as on a red Ford Taurus owned by Sparks.

On January 4, 2012, law enforcement personnel observed Leon Taunah at the residence of Sparks. Taunah, who was driving a Dodge Neon, left the residence and drove to Creative Tattoos. A few minutes later, appellant arrived at the tattoo shop. Taunah was observed leaving the tattoo shop and state troopers subsequently stopped his vehicle. A search of the vehicle by troopers revealed receipts from various pharmacies, as well as prescription pill bottles for Oxycodone 30 milligram pills. In February 2012, law enforcement officials pulled over a vehicle belonging to Smith; the officials searched the vehicle, discovering prescriptions, pharmacy receipts, and a document listing the names and phone numbers of 102 pharmacies.

Detective Ehrenborg testified that his investigation revealed three organizations or groups headed by Rhodes, Sparks, and appellant. According to the detective, the

investigation indicated that "approximately 46,000 Oxycodone 30s" were obtained during the time frame (April 2010 through February 2012) in which individuals were making trips to obtain prescriptions. (Tr. 762.) The detective estimated that the street value of the Oxycodone 30 milligram pills was approximately $920,000.

Following deliberations, the jury returned verdicts finding appellant guilty of engaging in a pattern of corrupt activity and 18 counts of aggravated funding of drug trafficking in case No. 12CR–3961, as well as 7 counts of aggravated funding of drug trafficking in case No. 13CR–5503. By judgment entry filed November 26, 2013, the trial court sentenced appellant in case No. 12CR–3961 to 7 years of incarceration for the count of engaging in a pattern of corrupt activity, and 3 years of incarceration each as to the 18 counts of aggravated funding of drug trafficking, with all counts to be served consecutive to each other, and to be served consecutive to 3 years incarceration imposed in case No. 13CR–5503.

*State v. Johnson*, 40 N.E.3d 628, 633–643 (Ohio Ct. App. 2015) (paragraph symbols and heading omitted).

## B.  Direct Appeal

Petitioner appealed, raising five assignments of error:

[I.] Defendant–Appellant's convictions for engaging in a pattern of corrupt activity and aggravated funding of drug trafficking are not supported by sufficient evidence to satisfy the requirements of the Due Process Clause of the Fourteenth Amendment to the United States Constitution.

[II.] The State violated Defendant–Appellant's Sixth and Fourteenth Amendment rights to counsel of choice and due process when it misrepresented and concealed material information regarding the expected testimony of its informant in order to manufacture a sham conflict of interest and disqualify Defendant–Appellant's retained attorney.

[III.] The cumulative effect of the trial court's erroneous evidentiary rulings, restriction on cross-examination, and a defective specific intent instruction deprived Defendant–Appellant of his Sixth and Fourteenth Amendment right to a fundamentally fair trial and reliable jury verdict.

[IV.] Defendant–Appellant was denied his right to the effective assistance of counsel as guaranteed by the Sixth and Fourteenth Amendments to the United States Constitution.

> [V.] Defendant–Appellant's consecutive prison sentence totaling 64–years is clearly and convincingly contrary to law and/or an abuse of discretion.

*Id.* at 643. The appellate court affirmed, *id.*, and on February 10, 2016, the Ohio Supreme Court declined to accept jurisdiction of the appeal, *Johnson*, 144 Ohio St.3d 1477 (Ohio 2016).

### C. Federal Habeas

On February 9, 2017, Petitioner, represented by counsel, filed this case. He asserts five claims for relief:

> **GROUND ONE**: The State deprived Petitioner of his Sixth and Fourteenth Amendment right to counsel of choice and right to due process by manufacturing a sham conflict of interest to disqualify his retained attorney.

> **GROUND TWO**: Petitioner's convictions are not supported by sufficient evidence to satisfy the Due Process requirements of the Fourteenth Amendment.

> **GROUND THREE**: Restrictions on cross-examination, erroneous evidentiary rulings, and defective jury instructions deprived Petitioner of his Sixth and Fourteenth Amendment right to due process and a fair trial.

> **GROUND FOUR**: The deficient performance of appointed counsel prejudiced Petitioner's defense to the charges and deprived him of his Sixth and Fourteenth Amendment right to the effective assistance of counsel.

> **GROUND FIVE**: The imposition of an enhanced sentence as punishment for Petitioner's decision to go to trial deprived him of his Sixth and Fourteenth Amendment right to due process and a jury trial.

*Petition* (Doc. 1, PAGEID# 5, 7, 8, 10, 12.)

## II. STANDARD OF REVIEW

### A. Merits

Because Petitioner seeks habeas relief under 28 U.S.C. § 2254, the Antiterrorism and Effective Death Penalty Act ("AEDPA") governs this case. The United States Supreme Court has described AEDPA as "a formidable barrier to federal habeas relief for prisoners whose

claims have been adjudicated in state court" and emphasized that courts must not "lightly conclude that a State's criminal justice system has experienced the 'extreme malfunction' for which federal habeas relief is the remedy." *Burt v. Titlow*, ––– U.S. –––, 134 S. Ct. 10, 16 (2013) (quoting *Harrington v. Richter*, 562 U.S. 86 (2011)); *see also Renico v. Lett*, 559 U.S. 766, 773 (2010) ("AEDPA . . . imposes a highly deferential standard for evaluating state-court rulings, and demands that state court decisions be given the benefit of the doubt.") (internal quotation marks, citations, and footnote omitted).

AEDPA limits the federal courts' authority to issue writs of habeas corpus and forbids a federal court from granting habeas relief with respect to a "claim that was adjudicated on the merits in State court proceedings" unless the state court decision either:

(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

(2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d). Further, the factual findings of the state court are presumed to be correct:

In a proceeding instituted by an application for a writ of habeas corpus by a person in custody pursuant to the judgment of a State court, a determination of a factual issue made by a State court shall be presumed to be correct. The applicant shall have the burden of rebutting the presumption of correctness by clear and convincing evidence.

28 U.S.C. § 2254(e)(1).

Accordingly, "a writ of habeas corpus should be denied unless the state court decision was contrary to, or involved an unreasonable application of, clearly established federal law as determined by the Supreme Court, or based on an unreasonable determination of the facts in light of the evidence presented to the state courts." *Coley v. Bagley*, 706 F.3d 741, 748 (6th Cir. 2013)

(citing *Slagle v. Bagley*, 457 F.3d 501, 513 (6th Cir. 2006)).  The United States Court of Appeals

for the Sixth Circuit has summarized these high standards:

> A state court's decision is "contrary to" Supreme Court precedent if (1) "the state
> court arrives at a conclusion opposite to that reached by [the Supreme] Court on a
> question of law[,]" or (2) "the state court confronts facts that are materially
> indistinguishable from a relevant Supreme Court precedent and arrives" at a
> different result. *Williams v. Taylor*, 529 U.S. 362, 405, 120 S.Ct. 1495, 146
> L.Ed.2d 389 (2000). A state court's decision is an "unreasonable application"
> under 28 U.S.C. § 2254(d)(1) if it "identifies the correct governing legal rule from
> [the Supreme] Court's cases but unreasonably applies it to the facts of the
> particular...case" or either unreasonably extends or unreasonably refuses to extend
> a legal principle from Supreme Court precedent to a new context. *Id.* at 407, 529
> U.S. 362, 120 S.Ct. 1495, 146 L.Ed.2d 389.

*Id.* at 748–49.  The burden of satisfying AEDPA's standards rests with the petitioner.  *See Cullen

v. Pinholster*, 563 U.S.170, 181 (2011).

### B.  Procedural Default

Congress has provided that state prisoners who are in custody in violation of the

Constitution or laws or treaties of the United States may apply to the federal courts for a writ of

habeas corpus. 28 U.S.C. § 2254(a).  In recognition of the equal obligation of the state courts to

protect the constitutional rights of criminal defendants, and in order to prevent needless friction

between the state and federal courts, a state criminal defendant with federal constitutional claims

is required to present those claims to the state courts for consideration.  28 U.S.C. § 2254(b), (c).

If the prisoner fails to do so, but still has an avenue open to present the claims, then the petition

is subject to dismissal for failure to exhaust state remedies.  *Id.*; *Anderson v. Harless*, 459 U.S. 4,

6 (1982) (*per curiam*) (citing *Picard v. Connor*, 404 U.S. 270, 275–78 (1971)).  Where a

petitioner has failed to exhaust claims but would find those claims barred if later presented to the

state courts, "there is a procedural default for purposes of federal habeas . . . ."  *Coleman v.

Thompson*, 501 U.S. 722, 735 n. 1 (1991).  This Court may *sua sponte* raise the issue of

procedural default when conducting preliminary review of the habeas corpus petition under Rule 4. *See Watkins v. Warden, Dayton Corr. Inst.*, No. 2:16-cv-00501, 2016 WL 4394138, at *2 (S.D. Ohio Aug. 18, 2016) ("[A]lthough federal courts are not required to raise procedural default *sua sponte*, neither are they precluded from doing so.").

The term "procedural default" has come to describe the situation where a person convicted of a crime in a state court fails (for whatever reason) to present a particular claim to the highest court of the State so that the State has a fair chance to correct any errors made in the course of the trial or the appeal before a federal court intervenes in the state criminal process. This "requires the petitioner to present 'the same claim under the same theory' to the state courts before raising it on federal habeas review." *Hicks v. Straub*, 377 F.3d 538, 552–53 (6th Cir. 2004) (quoting *Pillette v. Foltz*, 824 F.2d 494, 497 (6th Cir. 1987)). One of the aspects of "fairly presenting" a claim to the state courts is that a habeas petitioner must do so in a way that gives the state courts a fair opportunity to rule on the federal law claims being asserted. That means that if the claims are not presented to the state courts in the way in which state law requires, and the state courts therefore do not decide the claims on their merits, neither may a federal court do so. As the Supreme Court found in *Wainwright v. Sykes*, 433 U.S. 72, 87 (1977), "contentions of federal law which were not resolved on the merits in the state proceeding due to respondent's failure to raise them there as required by state procedure" also cannot be resolved on their merits in a federal habeas case—that is, they are "procedurally defaulted."

In the Sixth Circuit, a four-part analysis must be undertaken to determine if a federal habeas claim is waived by the petitioner's failure to observe a state procedural rule. *See Maupin v. Smith*, 785 F.2d 135, 138 (6th Cir. 1986). "First, the court must determine that there is a state procedural rule that is applicable to the petitioner's claim and that the petitioner failed to comply

with the rule." *Id.* Second, the Court must determine whether the state courts actually enforced the state procedural sanction. *Id.* Third, it must be decided whether the state procedural forfeiture is an adequate and independent state ground upon which the state can rely to foreclose review of a federal constitutional claim. *Id.* Finally, if the Court has determined that a state procedural rule was not complied with, and that the rule was an adequate and independent state ground, then the petitioner must demonstrate that there was cause for the failure to follow the procedural rule and the alleged constitutional error caused actual prejudice. *Id.* This "cause and prejudice" analysis applies to failures to raise or preserve issues for review at the appellate level. *Leroy v. Marshall*, 757 F.2d 94, 95 (6th Cir. 1985).

## III.  DISCUSSION

### A.  Ground One:  Denial of Counsel of Choice

Petitioner's first ground for relief asserts that he was deprived of his Sixth Amendment right to counsel of his choice and his Fourteenth Amendment right to due process because the prosecutors "manufactured a sham conflict of interest" in order to disqualify his retained attorney, Javier Armengau.  Specifically, Petitioner contends that the prosecutors misrepresented and concealed material information regarding the expected testimony of the CI whom Mr. Armengau previously represented.[1]

The Sixth Amendment provides that "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to have the Assistance of Counsel for his defence."  U.S. Const. amend. VI. "[A]n element of this right is the right of a defendant who does not require appointed counsel to

---

[1] Although Petitioner at times characterizes his first ground for relief as a prosecutorial misconduct claim, he fails to frame the argument in this way.  Petitioner, who is represented, instead pursues his argument under the Sixth Amendment.  Specifically, Petitioner states that "unjustified deprivation of the right to counsel is 'structural,' thereby relieving [him] of any duty to demonstrate prejudice." *Traverse*, Doc. 16, PAGEID# 1794.  Prosecutorial misconduct claims of course require a showing a prejudice. *See, e.g.*, *United States v. Coker*, 514 F.3d 562 (6th Cir. 2008) ("Prosecutorial misconduct requires showing prejudice[.]").  Consequently, the Court considers Petitioner's first ground under the Sixth Amendment and not as a prosecutorial misconduct claim.

choose who will represent him." *United States v. Gonzalez-Lopez*, 548 U.S. 140, 144 (2006) (citing *Wheat v. United States*, 486 U.S. 153, 159 (1988)). "'[T]he Sixth Amendment guarantees a defendant the right to be represented by an otherwise qualified attorney whom that defendant can afford to hire, or who is willing to represent the defendant even though he is without funds.'" *Id.* (quoting *Caplin & Drysdale, Chartered v. United States*, 491 U.S. 617, 624–25(1989)).

The right to counsel of choice, however, "is circumscribed in several important respects." *Wheat*, 486 U.S. at 159. Relevant here, the Supreme Court has made clear that trial courts must take care to investigate potential conflicts not only for the criminal defendant himself but also to ensure that "criminal trials are conducted within the ethical standards of the profession and that legal proceedings appear fair to all who observe them." *Id.* at 160. This, however, is no easy task, as the Supreme Court has observed:

> Unfortunately for all concerned, a district court must pass on the issue whether or not to allow a waiver of a conflict of interest by a criminal defendant not with the wisdom of hindsight after the trial has taken place, but in the murkier pretrial context when relationships between parties are seen through a glass, darkly. The likelihood and dimensions of nascent conflicts of interest are notoriously hard to predict, even for those thoroughly familiar with criminal trials. It is a rare attorney who will be fortunate enough to learn the entire truth from his own client, much less be fully apprised before trial of what each of the Government's witnesses will say on the stand. A few bits of unforeseen testimony or a single previously unknown or unnoticed document may significantly shift the relationship between multiple defendants. These imponderables are difficult enough for a lawyer to assess, and even more difficult to convey by way of explanation to a criminal defendant untutored in the niceties of legal ethics. Nor is it amiss to observe that the willingness of an attorney to obtain such waivers from his clients may bear an inverse relation to the care with which he conveys all the necessary information to them.

*Id.* at 162.

The Court has also noted that such situations put trial judges in a bind—"trial courts confronted with multiple representations face the prospect of being 'whipsawed' by assertions of error no matter which way they rule." *Id.* at 161. On the one hand, if a trial court "agrees to the

multiple representation, and the advocacy of counsel is thereafter impaired as a result, the defendant may well claim that he did not receive effective assistance." *Id.* But, on the other, a trial court's "refusal to accede to the multiple representation may result in a challenge such as petitioner's in this case." *Id.* Considering all of this, the Supreme Court has held that a trial judge "must be allowed substantial latitude in refusing waivers of conflict of interest not only in those rare cases where an actual conflict may be demonstrated before trial, but in the more common cases where a potential for conflict exists which may or may not burgeon into an actual conflict as the trial progresses." *Id.* at 163. Indeed, the "evaluation of the facts and circumstances of each case under this standard must be left primarily to the informed judgment of the trial court." *Id.* at 164. In situations like this—where the court has significant "leeway" in reaching an outcome, it follows that it is "less likely" that a state court's application of the rule will be unreasonable" under AEDPA. *Yarborough v. Alvarado*, 541 U.S. 652, 664 (2004).

Here, the trial judge took care to understand the potential conflict. Specifically, he required a detailed affidavit from the CI:

> THE COURT: … This issue turns for me very heavily on – obviously the defendant has a very important right to an attorney of his choice, and he's made his choice here – is whether the state is calling the confidential informant, and whether the confidential informant indeed has information, whether Mr. Armgengau believes it or not, or the state believes it or not, is the confidential informant going to testify against Mr. Johnson. That is very clear. That is the issue. I have two representations here today. I have a representation from the state that you are going to call him and that he has information against Mr. Johnson. Is that correct? Is that the state's representation?
>
> MR. MANNING: Yes.
>
> THE COURT: And the defense's representation is based on your knowledge he has no information that would impact Mr. Johnson in this particular case.
>
> MR. ARMENGAU: He has none.

THE COURT: Okay. The fact that each of you say these things doesn't necessarily make them true. Please be seated.

Obviously the court's concern is if the state's right, if the state is correct, having to declare a mistrial halfway through the trial is not something I want to have happen. Conversely, if the state's representation is not correct, I don't want to deny Mr. Johnson the right to the attorney of his choice.

So I need to figure out a way or you two need to figure out a way, be it affidavit or otherwise from the confidential informant as to confirming the fact that he's going to testify and he has information. You don't have to – the affidavit does not have to reveal the details of that. But I need something to get over this hurdle. I have two representations from people I respect. And I don't put attorneys under oath. I believe that when you're speaking to a court, I accept your professional representations. So that's where I am.

…

THE COURT: … That thing I have, that issue in front of me, I would like that issue addressed. I will withhold ruling. I will issue the ruling in writing so that either side can appeal the same should they think it appropriate. But again therein lies my problem. I have these two competing interests. I think I can get past the telephone call, although it starts making things a little more difficult.

But my primary concern is the confidential informant, that he's going to be called, and that he does have information that can be used against, again, against Mr. Johnson. I'm not asking in that affidavit what information he has, but I need some representation that it's there. And then I will make my ruling accordingly.

Anything further on behalf of the state?

MR. GIBSON: Do you need something written from [the CI]?

THE COURT: Yes. I need – I'd like an affidavit to that effect.

MR. GIBSON: Just saying, "I'm going to testify against his interests" without saying what he's going to say. I'm just trying to get how much detail I need.

THE COURT: That he has agreed to testify, the state's already said that they are going to call him, that he does not intend to take the Fifth Amendment, and that he has information against Mr. Johnson in this case, not against Mr. Johnson's credibility. Because if Mr. Johnson doesn't take the stand, well, that's not an issue. It has to be as to issues in this case. Now, the more detailed you're willing to get in that affidavit, the more it helps your motion. The more general you want it to be, it's at your peril.

*Motion for Leave to Expand the Record*, Exhibit 1, Doc. 14-1, PAGEID# 1763–67.

In his affidavit, the CI swore, in relevant part, that:

8. On or about September 14, 2012, Javier Armengau called me and asked me to come to his office.

9. Javier Armengau asked me about the investigation into this case involving the conspiracy of 47 co-defendants and asked me whether I was testifying against everyone.

10. I told Javier Armengau that I was concerned that not testifying would break my deal in Federal Court so I told Javier Armengau that I would be testifying to all the information learned as a confidential informant.

11. Javier Armengau gave me legal advice saying he felt that not testifying would not be in violation of my defendant's agreement in Federal Court.

12. I advised Javier Armengau that I believed it would violate the terms of my defendant's agreement and that I would be testifying against the interests of Michael Paul Johnson.

13. Javier Armengau asked me if I ever wore a wire on Johnson or if I ever recorded a conversation with Johnson.

14. I told Javier Armengau I did not and Javier Armengau then said I have nothing to worry about.

15. I told Javier Armengau that regardless I will testify against Michael Paul Johnson and Javier Armengau knew that my testimony would be against the interests of Michal Paul Johnson.

16. If called to testify regarding information learned as a confidential informant which was passed on to IRS agent Bogner while in the capacity of being a confidential informant I would testify that Michael Paul Johnson is at the top of the hierarchy of the organization. Just below Michael Paul Johnson Michael Paul Johnson is Ruben Rhodes and Robert Sparks. Michael Paul Johnson was funding all the trips to Florida and elsewhere to illegally obtain prescription pills for sale.

*Sealed Affidavit*, Doc. 18, PAGEID# 1820–21.

Mr. Armengau also submitted an affidavit, swearing, in relevant part:

11. On September 14, 2012, outside of Courtroom 5A, Joe Gibson indicated that he was moving to disqualify counsel due to Counsel's representation of [the CI] in Federal Court. By that point in time (9/14/12) and prior to and including the time of the filing of the Motion to Disqualify Counsel, August 24, 2012, Joe Gibson had not even interviewed or spoke to [the CI]. In fact, Jason Manning

hadn't even spoken to [the CI] regarding ANY anticipated testimony. Since neither prosecutor had spoken to [the CI] regarding what information he could provide that would be both relevant and admissible, Affiant stated to Joe Gibson that he (Affiant) was unsure if [the CI] had any further obligation to cooperate in any respect as part of his plea agreement in Federal Court. Upon Affiant making that statement to Joe Gibson, Joe Gibson then stated that if [the CI] refused to testify he would then be indicted in this very case by the Franklin County Prosecutor's Office.

12. Subsequent to leaving Court, Counsel/Affiant, in order to make certain no conflict existed and to make certain that Affiant possessed all of the necessary facts, contacted [the CI] and met with him at Affiant's office. Affiant first advised [the CI] that he needed to call and cooperate with the State (Prosecutor's (sic) did not have a contact number for [the CI]). Joe Gibson wanted to speak to him but had no way of contacting him. Secondly, Counsel in order to determine what possible conflict could exist, inquired of [the CI] as to whether he ever had any dealings with Michael Paul Johnson that were in any way illegal in nature and [the CI] advised that he had not and further advised that any information he had regarding the allegations against Michael Paul Johnson were strictly second-hand from Robert Sparks;

13. Since Robert Sparks has already pleaded Guilty and has been sentenced, Affiant does not believe that any anticipated testimony by [the CI] against Michael Paul Johnson would be remotely admissible;

14. The extent of my concern over any anticipated testimony by [the CI] was only limited to whether he had any personal dealings or direct knowledge of or about Michael Paul Johnson and that was to determine whether any conflict existed;

15. I never told [the CI] that he should not cooperate with authorities. In fact I contacted him and advised him to contact Joe Gibson. In addition, most recently, Jason Manning advised me that he did not have a phone number for [the CI] and that he needed to speak to him in order to create the "Affidavit" that he needed him to sign. Upon returning to my office I emailed the phone number I had for [the CI] to Jason Manning so he could in fact get in touch with him;

16. [The CI] indicated that he advised Joe Gibson and Jason Manning that he would testify consistently with his prior statements to the United States' Government during his proffers but that he had no direct knowledge of anything regarding the allegations against Michael Paul Johnson; …

*Sealed Affidavit*, Doc. 19, PAGEID# 1823–24.

After considering the affidavits, the trial judge found the potential conflict disqualifying:

The core of the State's argument is that Attorney Armengau previously represented the CI and that it intends to call the CI to testify against the defendant in this case. Several facts are not in dispute. First, CI is not a co-defendant in this case. Second, Attorney Armengau did represent CI in a federal drug case that resulted in a plea agreement and a defendant's agreement. Third, the State has stated in court, on the direct, in direct response to a question by the Court, that it intends to call the CI as a witness against the defendant. Fourth, according to the affidavit of the CI, he has evidence adverse to the interests of the defendant and he is going to testify on behalf of the State.

Attorney Armengau argues that his representation of the CI is over and that the CI has no firsthand knowledge of any activities of the defendant that are relevant to this case.

…

Attorney Armengau, citing *Wheat*, expresses the Supreme Court's concern that "the Government may seek to 'manufacture' a conflict in order to prevent a defendant from having a particularly able defense counsel at his side ****. *Wheat*, 486 U.S. at 163, 108 S.Ct. 1692, 100 L.Ed.2d 140. The Court shares that concern. That is precisely why the Court insisted that the State provide a very detailed affidavit from the CI. It is also why the Court insisted that the State go on record that it intends to call the CI as a witness.

Based on the foregoing, the Court is satisfied that the State has not manufactured a conflict.

The Court is also concerned about the CI's obligation to testify in this case pursuant to the defendant's agreement that was negotiated as part of his plea in federal court. Admittedly, that may not be an issue because CI claims he will testify regardless. That could change, however. Then Attorney Armengau, who negotiated the deal, may have to give the CI advice as to his obligation pursuant to the defendant's agreement. If he advises the CI that he does not have to testify so as to help his current client, it could have very serious consequences to the CI if his advice is incorrect.

Finally, the Court must address the issue of actual-versus-potential consequences. The Court agrees with Attorney Armengau that the conflict herein is more potential than actual. That does not, however, eliminate or lessen this Court's obligation or concerns. Admittedly, the Court will not know the full potential extent of the conflict until the CI testifies. At that time, however, it will be too late to remedy the problem short of a mistrial if, as he alleges in his affidavit, the CI has admissible adverse evidence against the defendant.

It is at this point that the potential conflict becomes an actual conflict. Attorney Armengau will be forced to challenge the CI's credibility. To do so, he may have to use information that is still confidential that he learned about the CI during his

prior representation. Even if it is not, how can an attorney challenge the credibility of a witness he previously represented; especially one who signed a defendant's agreement that both the attorney and the client represented to another court as truthful?

*Decision and Entry* dated November 19, 2012, Doc. 6-1, PAGEID# 202–04.

Petitioner took an interlocutory appeal and lost. *Johnson*, 10th Dist. No. 12AP–1067, 2013-Ohio-1682, 2013 WL 1791065 (April 25, 2013).

After conviction, Petitioner again challenged Attorney Armengau's disqualification. The state appellate court rejected the claim on the merits:

> [A]ppellant contends the state violated his right to counsel of choice in moving to disqualify attorney Javier Armengau prior to trial. Appellant argues that the state misrepresented and concealed material information regarding the expected testimony of the CI in order to manufacture a sham conflict of interest and thereby disqualify Armengau from representing him.
>
> As noted under the facts, on August 24, 2012, approximately one year prior to trial, the state filed a motion to disqualify counsel on the basis of an alleged conflict of interest, *i.e.*, that attorney Armengau was currently representing an informant utilized by law enforcement investigators in the instant case. In its motion, the state represented that it intended to call the CI as a witness at trial. On October 3, 2012, the trial court conducted a hearing on the motion to disqualify, during which the prosecutor noted that attorney Armengau had negotiated a plea agreement in federal court on behalf of the CI; the prosecutor expressed his view that the CI had an ongoing obligation to testify in the current case. The state further represented that it intended to call the CI as a witness, and noted that Armengau might be required to advise the CI "whether * * * or not testifying would break the defendant's agreement," as well as "whether to take the Fifth or not." (Oct. 3, 2012 Tr. 4.) The prosecutor also argued that the CI had spoken with another potential witness, Sparks, and that Sparks had requested that the CI "call Mr. Armengau to ask legal advice as to whether or not to take the deal offered." (Oct. 3, 2012 Tr. 5.)
>
> Attorney Armengau stated during the hearing that "[t]he confidential informant, who I did work out a plea agreement for in federal court, has never in federal court or anywhere else given any information on [appellant]. * * * He's never had any dealings with [appellant] in any capacity." (Oct. 3, 2012 Tr. 7.) At the close of the hearing, the trial court expressed concern that the CI is "going to be called, and that [the CI] does have information that can be used against * * * [appellant]." (Oct. 3, 2012 Tr. 14.) The court therefore requested the prosecution to submit an affidavit regarding the CI's knowledge of appellant's activities.

On October 23, 2012, the state filed under seal the affidavit of the CI. In response, attorney Armengau filed his own affidavit. By decision and entry filed November 19, 2012, the trial court granted the state's motion to disqualify counsel. In its decision, the court cited concern regarding the CI's "obligation to testify in this case pursuant to the defendant's agreement that was negotiated as part of his plea in federal court," and the fact that attorney Armengau, "who negotiated the deal, may have to give the CI advice as to his obligation pursuant to the defendant's agreement." The court acknowledged it "will not know the full potential extent of the conflict until the CI testifies," but noted, "[a]t that time * * * it will be too late to remedy the problem short of a mistrial if, as he alleges in his affidavit, the CI has admissible adverse evidence against the defendant." The court also indicated it was "satisfied that the State has not manufactured a conflict." As indicated under the facts, after the trial court rendered its decision granting the state's motion to disqualify counsel, appellant filed an interlocutory appeal. In *Johnson*, this court affirmed the decision of the trial court granting the state's motion to disqualify.

Appellant argues the prosecution submitted a misleading affidavit to the trial court, leaving the court with the impression the CI possessed a substantial body of first-hand knowledge implicating him. Appellant maintains that later developments at trial confirmed the state had fabricated an alleged conflict of interest. According to appellant, the CI's trial testimony indicates the CI's sole knowledge came from information received by co-defendant Sparks. Appellant further argues that the prosecution had a duty to inform the trial court that this "tiny snippet of testimony" was the entirety of the information the CI could provide against him.

In general, "[t]he Sixth Amendment to the Constitution guarantees that '[i]n all criminal prosecutions, the accused shall enjoy the right * * * to have the Assistance of Counsel for his defence.'" *Wheat v. United States*, 486 U.S. 153, 158, 108 S.Ct. 1692, 100 L.Ed.2d 140 (1988). Accordingly, "[a] criminal defendant who desires and is financially able to retain his own counsel 'should be afforded a fair opportunity to secure counsel of his own choice.' " *Serra v. Michigan Dept. of Corrections*, 4 F.3d 1348, 1351 (6th Cir.1993), quoting *Powell v. Alabama*, 287 U.S. 45, 53, 53 S.Ct. 55, 77 L.Ed. 158 (1932). Although a criminal defendant "who can afford his own attorney has a right to his chosen attorney, that right is a qualified right." *Id*. at 1351 citing *Wheat* at 159, 108 S.Ct. 1692. As such, a "trial court 'must recognize a presumption in favor of [a defendant's] counsel of choice, but that presumption may be overcome not only by a demonstration of actual conflict but by a showing of a serious potential for conflict. The evaluation of the facts and circumstances of each case under this standard must be left primarily to the informed judgment of the trial court.'" *Id*., quoting *Wheat* at 164, 108 S.Ct. 1692.

In *Wheat*, the United States Supreme Court recognized circumstances in which "the Government may seek to 'manufacture' a conflict in order to prevent a defendant from having a particularly able defense counsel at his side." *Id*. at 163, 108 S.Ct. 1692. The United States Supreme Court further noted, however, that "trial courts are undoubtedly aware of this possibility, and must take it into consideration along with all of the other factors which inform this sort of a decision." *Id*.

At the outset, we find unpersuasive appellant's contention that the CI had no first-hand information to offer, and that the CI's sole source of information was from Sparks. In his affidavit, the CI related information appellant had provided him, as well as information regarding discussions he had with attorney Armengau. At trial, the CI testified that he had sold marijuana to Sparks, and that he met appellant in 2010 through Sparks. The CI stated he had "a pretty good relationship" with appellant, and that they "went in together on a car lot." (Tr. 612.) The CI became an informant for the federal government following his conviction for conspiracy to distribute marijuana. In summer 2011, the CI witnessed Sparks leaving for trips to Florida, and he also observed Sparks talking with other individuals about taking trips to Florida. According to the CI's understanding, "the people that rode along with the trips were the actual ones going to the doctor to get the pills and then being compensated for their travel, and the person funding was the individual providing the money." (Tr. 617.) The CI testified that Sparks would either drive his own vehicle or he would sometimes rent vehicles for the Florida trips. The CI observed Sparks leave for trips with various individuals, and also observed Sparks buy airline tickets for some of the trips.

In July 2011, Sparks asked the CI to dispose of some "[e]mpty and some full pill bottles." (Tr. 620.) Sparks asked the CI to dispose of them because the CI had access to a "dumpster that I would be renting." (Tr. 620.) Sparks also provided the CI with some prescription receipts. The CI gave the pill bottles and receipts to a federal agent. At trial, the state introduced as exhibits a receipt bearing the name of Malik Willoughby, who the CI testified was one of the individuals taking trips to Florida with Sparks, and pill bottles listing Willoughby's name as well as the names of Carter and Dustin Childers. The CI identified other exhibits, including a Florida driver's license for Sparks, prescription receipts bearing Sparks' name, identification for Carter, a pharmacy receipt in the name of Ronald Barrowman, and empty pill bottles bearing the names of Barrowman and Willoughby. The CI testified that he had provided all of the above items to the federal agent. Sparks also spoke with the CI about the trips, including information as to who was funding the trips. The CI informed the federal agent that "Sparks had his people that he was sending, Ruben Rhodes had his group of people, and [appellant] had his group of people, according to Robert." (Tr. 634.)

As noted, following the hearing on the motion to disqualify, the trial court granted the state's motion on the basis that attorney Armengau's representation of the CI,

who the state intended to call as a witness in appellant's trial, created a serious potential for conflict. In this court's decision affirming the trial court's granting of the state's motion to disqualify, we found merit with the trial court's analysis. Specifically, this court noted that, in the event "the CI is placed on the witness stand and testifies while Armengau represents Johnson, an un-resolvable conflict exists. Armengau cannot damage his former client's credibility through use of privileged information. At the same time, Armengau must diligently represent Johnson's interests by damaging the CI's credibility." *Johnson* at ¶ 5. This court further noted that "ethical problems have already arisen in this case" based upon Armengau's admission that "he has already had a meeting with the CI since Armengau was retained by [appellant]." *Id.* at ¶ 6.

Here, at the time of the motion, the state cited a valid concern regarding a clear potential for conflict. Courts have recognized the "obvious" potential for conflict where defense counsel "is under a duty to represent zealously the defendant, while on the other hand, he has a duty of confidentiality to his former client, the government witness." *United States v. Falzone*, 766 F. Supp. 1265, 1271 (W.D.N.Y.1991). In this respect, "numerous cases have recognized" that an attorney's duty of loyalty to a client "requires disqualification when a former client seeks to cooperate with the government and testify against the present client." *United States v. Alvarez*, S.D. Fla. No. 10–20547–CR, 2010 WL 4774649 (Nov. 16, 2010). The potential for conflict arises especially in the context of cross-examination, as defense counsel's "most important function" during a criminal trial is to "vigorously cross-examine the government's witness." *Falzone* at 1271. *See also United States v. Moscony*, 927 F.2d 742, 750 (3d Cir.1991) ("Conflicts of interest arise whenever an attorney's loyalties are divided * * * and an attorney who cross-examines former clients inherently encounters divided loyalties."). Further, "there need not be a 'substantial relationship' between the subject matter of the prior representation and the issues in the present case before disqualification is warranted." *Falzone* at 1275. Rather, "[a]ll that is required is that the interest of the defendant potentially conflicts with the interest of the former client." *Id.*

Upon review, the record does not demonstrate bad faith on the part of the state in bringing the potential conflict to the attention of the trial court. While appellant challenges the affidavit of the CI in support of the motion to disqualify, there is nothing in the record to suggest the state misrepresented what the CI indicated he knew at that time, or that the state brought the motion as a strategy to deprive appellant of Armengau's representation. As noted, the state represented at the hearing on the motion that it intended to call the CI as a witness, and the CI ultimately did testify. As also discussed, the record does not support appellant's contention that the only information the CI possessed was through conversations with Sparks. Rather, the CI testified not only to information Sparks provided, but also his "personal observation[s]" and conduct. (Tr. 630.) Here, notwithstanding the benefit of hindsight in the form of the CI's trial testimony, appellant has not

demonstrated that the state acted improperly in filing the motion to disqualify counsel by attempting to manufacture a conflict of interest.

Accordingly, the second assignment of error is not well-taken and is overruled.

*Johnson*, 40 N.E.3d at 647–51.

Petitioner contends that he is entitled to habeas relief on this ground because the state appellate court both unreasonably applied clearly established federal law and unreasonably determined the facts in light of the record. The Court disagrees.

Contrary to Petitioner's argument, the state appellate court's analysis demonstrates a firm understanding of the relevant facts and applicable law. Regarding the facts, the appellate court found unpersuasive appellant's contention that the CI had no first-hand information to offer and that the CI's sole source of information was from Sparks. Based upon the record, that was not an unreasonable factual determination. The CI testified that he had known Petitioner for two years and had a "pretty good relationship" with him. (Doc. 6-5, PAGEID# 611–12.) The CI further testified that based upon his "personal observations" as well as information from Sparks, the CI served as a source to the government regarding Petitioner's illegal activity. (PAGEID# 630, 634).

Likewise, the state appellate court cited and reasonably applied Supreme Court precedent. Relying on *Wheat v. United States*, 486 U.S. 153 (1988), the appellate court recognized that both the facts and circumstances surrounding the disqualification of counsel are best determined by the trial court and that such determination must take into account the possibility that the government may seek to manufacture a conflict. Most significantly, as the appellate court acknowledged, the trial court undertook the fact-specific inquiry required in ruling on a disqualification motion. The state appellate court twice examined and upheld that

decision, finding that a serious potential for conflict existed. That is not an unreasonable application of *Wheat*.

In sum, Petitioner cannot overcome AEDPA's high standards with regard to his counsel-of-choice claim. *See Kennedy v. Stewart*, 567 F. App'x 433, 435 (6th Cir. 2014) ("Given *Wheat*'s broad rule and AEDPA deference, we decline to disturb the state court's decision [regarding counsel's disqualification].").

**B. Ground Two: Insufficient Evidence**

Petitioner next argues that insufficient evidence supports his convictions for aggravated funding of drug trafficking and engaging in a pattern of corrupt activity. Respondent contends that this claim, including what Respondent has identified as three included sub-claims— insufficient evidence of funding trafficking, insufficient evidence of identity of the controlled substance, and failure to prove specific intent to sell or offer to sell more than the bulk amount of the drugs—fail on their merits. In Reply, Petitioner acknowledges these sub-claims but notes as a separate sub-claim the failure to prove a pattern of corrupt activity.

Before a criminal defendant can be convicted consistent with the United States Constitution, there must be evidence sufficient to justify a reasonable trier of fact to find guilt beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 319 (1979). In determining whether the evidence was sufficient to support a petitioner's conviction, a federal habeas court must view the evidence in the light most favorable to the prosecution. *Wright v. West*, 505 U.S. 277, 296 (1992) (citing *Jackson*, 443 U.S. at 319). Further, the prosecution is not required to "rule out every hypothesis except that of guilt." *Id.* (quoting *Jackson*, 443 U.S. at 326). And "a reviewing court 'faced with a record that supports conflicting inferences must presume—even if

it does not appear on the record—that the trier of fact resolved any such conflicts in favor of the prosecution, and must defer to that resolution.'" *Id.* (quoting *Jackson*, 443 U.S. at 326).

Moreover, federal habeas courts must afford a "double layer" of deference to state court determinations of the sufficiency of the evidence.  As explained in *Brown v. Konteh*, 567 F.3d 191, 205 (6th Cir. 2009), deference must be given, first, to the jury's finding of guilt because the standard, announced in *Jackson v. Virginia*, is whether "viewing the trial testimony and exhibits in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Id.*  Second, and even if a *de novo* review of the evidence leads to the conclusion that no rational trier of fact could have so found, a federal habeas court "must still defer to the state appellate court's sufficiency determination as long as it is not unreasonable."  *Id*; *see also White v. Steele*, 602 F.3d 707, 710 (6th Cir. 2009). Consequently, a habeas petitioner has a substantial hurdle to overcome.

The state appellate court considered Petitioner's second ground on the merits:

In reviewing "a record for sufficiency, '[t]he relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt.'" *State v. Fry*, 125 Ohio St.3d 163, 2010-Ohio-1017, 926 N.E.2d 1239, ¶ 146, quoting *State v. Jenks*, 61 Ohio St.3d 259, 574 N.E.2d 492 (1991), paragraph two of the syllabus.

The offense of engaging in a pattern of corrupt activity under R.C. 2923.32(A)(1) is defined as follows: "No person employed by, or associated with, any enterprise shall conduct or participate in, directly or indirectly, the affairs of the enterprise through a pattern of corrupt activity." An "enterprise" is defined to include "any individual, sole proprietorship, partnership, limited partnership, corporation, trust, union, government agency, or other legal entity, or any organization, association, or group of persons associated in fact although not a legal entity." R.C. 2923.31(C). An enterprise "includes illicit as well as licit enterprises." R.C. 2923.31(C). Pursuant to R.C. 2923.31(E), "'[p]attern of corrupt activity' means two or more incidents of corrupt activity * * * that are related to the affairs of the same enterprise, are not isolated, and are not so closely related to each other and connected in time and place that they constitute a single event."

Under R.C. 2923.31(I), "[c]orrupt activity" is defined to mean:

* * * [E]ngaging in, attempting to engage in, conspiring to engage in, or soliciting, coercing, or intimidating another person to engage in any of the following:
* * *

(2) Conduct constituting any of the following:

* * *

(c) Any violation of section * * * 2925.03, * * * 2925.05, * * * of the Revised Code, any violation of section 2925.11 of the Revised Code that is a felony of the first, second, third, or fourth degree and that occurs on or after July 1, 1996, * * * when the proceeds of the violation, * * * or the value of the contraband or other property illegally possessed, sold, or purchased in the violation exceeds one thousand dollars, or any combination of violations * * * when the total proceeds of the combination of violations * * * or value of the contraband or other property illegally possessed, sold, or purchased in the combination of violations exceeds one thousand dollars[.]

The offense of aggravated funding of drug trafficking is set forth under R.C. 2925.05, which states in part:

(A)    No person shall knowingly provide money or other items of value to another person with the purpose that the recipient of the money or items of value use them to obtain any controlled substance * * * for the purpose of selling or offering to sell the controlled substance in the following amount:

(1) If the drug to be sold or offered for sale is any compound, mixture, preparation, or substance included in schedule I or II, * * * an amount of the drug that equals or exceeds the bulk amount of the drug[.]

Appellant also contends the state failed to prove that he funded "another" person's trafficking. Appellant argues the state did not prosecute him on a theory he was passively financing the drug trafficking business of a third party but, rather, that he was recruiting drug addicts to obtain Oxycodone to market on his own.

The state responds that appellant's argument adds an additional element not contained in the statute, i.e., that the recipient of the money both obtain the controlled substances and sell or offer to sell them. The state argues there is no such requirement under R.C. 2925.05; instead, the state maintains, the statute only requires that the recipient of the money use it to obtain the controlled substance for purposes of future resale. We agree. *See, e.g.*, *State v. Turner*, 6th Dist. No. E–95–056, 1997 WL 543073 (Aug. 29, 1997) (evidence sufficient to support conviction for funding where defendant "expressed disappointment that he would

not be able to make money reselling the cocaine after it was clear that the sale would not take place"); *State v. Caudill*, 3d Dist. No. 05–97–35 (Dec. 2, 1998) (evidence sufficient to convict defendant of funding where defendant provided money to others used to obtain drugs in Texas that were subsequently delivered to defendant for distribution in Ohio).

Appellant first argues the state failed to prove the identity of the controlled substance. Specifically, appellant contends the state failed to lay a foundation or elicit lay testimony from the co-defendants regarding the identity of the pills allegedly turned over to him. According to appellant, the state's witnesses implicitly relied on the labeling of the prescription bottles when they testified the pills were Oxycodone; appellant maintains such evidence is insufficient to establish the identity of the contents of the pill bottle.

Under Ohio law, "the experience and knowledge of a drug user lay witness can establish his or her competence to express an opinion on the identity of a controlled substance if a foundation for this testimony is first established." *State v. McKee*, 91 Ohio St.3d 292, 297, 744 N.E.2d 737 (2001). Such evidence "meets the requirements of Evid. R. 701. It is testimony rationally based on a person's perceptions and helpful to a clear understanding of a fact in issue." *Id*. In order for drug identification testimony to be admissible under *McKee*, "the state need only establish the competence of the proposed lay witness." *State v. Gonzales*, 6th Dist. No. WD–13–086, 2015-Ohio-461, 2015 WL 502263, ¶ 23. Such competence "is established in this context by 'providing the court with a foundation that demonstrates that the lay witness has a sufficient amount of experience and knowledge either from having dealt with or having used the same type of controlled substance in the past that he or she is now being asked to identify.'" *Id*., quoting *State v. Maag*, 3d Dist. No. 5–03–32, 2005-Ohio-3761, 2005 WL 1712898, ¶ 37.

In the instant case, various witnesses for the state testified as to their addiction to, and extensive use of, prescription pain medications including Oxycodone. Robert stated he was addicted to the prescription drugs, and that "[i]t was a habit" for him. (Tr. 189.) MacDonald related that he usually "chose pills" instead of taking cash for the trips he took "because [of] my addiction." (Tr. 267.) With the pills he received, MacDonald "sold some to pay bills. But the majority of them I kept to eat them." (Tr. 267.) Anderson testified that he "was using the pills pretty good." (Tr. 410.) Smith would either sell or use the pills she kept from her trips. Richard acknowledged being "addicted" to these prescription medications following a back injury. (Tr. 532.) During his first trips he would receive some money, but "it got to where I got no money given to me. * * * I got to keep all the 15 milligrams [Oxycodone] and Somas and Xanax." (Tr. 534.)

Ohio courts have accepted similar lay witness testimony to establish the identity of a suspected substance. *See, e.g.*, *Johnson*, 4th Dist. No. 13CA16, 2014-Ohio-4032, 2014 WL 4557640, ¶ 42 (law officer's reliance on appellant's testimony

that she recognized Hydrocodone because of her previous prescription established a foundation for the officer to rely on appellant's identification of drug); *State v. Mielke*, 12th Dist. No. CA2012–08–079, 2013-Ohio-1612, 2013 WL 1712872, ¶ 42 (testimony by lay witness that he had been a past steroid user and distributor sufficient to establish controlled substances element of the offense of trafficking in drugs); *State v. Singleton*, 11th Dist. No. 2002–L–077, 2004-Ohio-1517, 2004 WL 605138, ¶ 23 (testimony of lay witnesses, including minors, that they had past experience using marijuana and cocaine sufficient to establish substances defendant provided to children were in fact marijuana and cocaine).

Under Ohio law, the state can establish the identity of a controlled substance through either direct or circumstantial evidence. *See State v. Bowling*, 12th Dist. No. CA2013–08–159, 2014-Ohio-1690, 2014 WL 1572410, ¶ 15 ("The government only needs to produce sufficient evidence, direct or circumstantial, from which the trier of fact is able to identify the substance beyond a reasonable doubt.").

Upon review of the testimony at issue, we find that the state presented a sufficient foundation (*i.e.*, that the co-defendants were familiar with the controlled substances at issue based upon their personal knowledge and prior experience using such drugs) such that these witnesses were qualified to testify with respect to the identity of the drugs. In addition to the lay testimony presented, the state also introduced prescription records, prescription receipts, as well as Oxycodone pills recovered during several police searches. Here, the subject testimony, as well as other circumstantial evidence presented, was sufficient to establish the identity of the substances beyond a reasonable doubt.

Appellant next asserts the state failed to prove he had specific intent to sell or offer to sell more than the bulk amount of the drugs. Appellant cites the lead detective's admission that he made no attempt to arrange an undercover purchase from appellant. Appellant further contends that the testimony of the co-defendants on this element was sketchy and uncertain.

In response, the state maintains there was direct evidence, based upon the testimony of other co-defendants, including Robert and Sparks, that these individuals purchased pills from appellant on multiple occasions. The state further points to evidence regarding the substantial quantity of Oxycodone pills obtained by multiple travelers every 28 days which, the state maintains, on each trip greatly exceeded the bulk amount; according to the state, the sheer number of pills procured evinces ample circumstantial evidence of intent to sell or resell.

To the extent appellant challenges the credibility of the co-defendants, *i.e.*, that their testimony was "sketchy," a reviewing court will not weigh the evidence in considering a sufficiency challenge. *See, e.g., State v. Green*, 117 Ohio App.3d 644, 650, 691 N.E.2d 316 (1st Dist.1996) ("In reviewing a legal-sufficiency

argument, a reviewing court cannot resolve evidentiary conflicts in favor of appellant or substitute its evaluation of witness credibility for the jury's.").

At trial, numerous co-defendants provided testimony that appellant paid them to travel to physician clinics in Florida to obtain pain prescriptions, including Oxycodone 30 milligram pills, and to then fill the prescriptions at various pharmacies. Upon returning to Ohio, the individuals tasked with leading the groups on the trips would collect and deliver the 30 milligram Oxycodone pills to appellant. The co-defendants also provided testimony as to the quantity of Oxycodone 30 milligram pills they procured on the trips, including Robert, who stated that he usually travelled to Florida with four to six individuals, and that on these trips each individual typically received prescriptions for either 160 or 210 Oxycodone 30 milligram pills, as well as 160 Oxycodone 15 milligram pills, 90 Xanax pills and 90 Soma pills. Robert testified as to approximately 12 trips he made to obtain Oxycodone and other medications. Robert related that he and his brother, Richard, went to appellant's residence to deliver between 600 to 800 Oxycodone 30 milligram pills. Robert also purchased Oxycodone 30 milligram pills from appellant on different occasions.

MacDonald testified that he traveled with other individuals to Florida almost weekly; during these trips each individual obtained either 180 or 240 Oxycodone 30 milligram pills. According to MacDonald, he made approximately 80 of these trips over an almost two-year period. Maxwell testified that he made 4 or 5 trips to Florida in 2010, and that appellant financed each of those trips. Smith made trips to Florida on a monthly basis; on these trips, she would procure 160 Oxycodone 30 milligram pills, as well as other pain medications including Xanax and Soma pills. Sparks testified that he purchased pills from appellant, including purchases of 360 Percocet pills on one occasion, and 100 Percocet pills on another. At trial, the parties stipulated that the bulk amount of Oxycodone 30 milligram pills, a Schedule II substance, is 15 unit doses or 15 pills.

Here, viewing the evidence most strongly in favor of the prosecution, as we are required to do in considering a sufficiency argument, we find that the state presented sufficient evidence for the jury to find that appellant obtained the controlled substances for the purpose of selling or offering to sell more than the bulk amount of the drugs. The record supports the state's contention that there was direct evidence that appellant sold pills on multiple occasions. Additionally, the state presented testimony, cited above, as to the quantity of drugs obtained by co-defendants during the nearly two-year period. The state also introduced exhibits including a chart listing the prescriptions for Oxycodone 30 milligram pills obtained by the various individuals, as well as individual pharmacy patient history records.

According to Detective Ehrenborg, over the time period from April 2010 to February 2012, the investigation revealed that the individuals traveling to Florida obtained approximately 46,000 Oxycodone 30 milligram pills, and that the street

value of the drugs obtained was $920,000. Further, the state presented other circumstantial evidence, including items recovered from appellant's residence, evincing an intent by appellant to sell or resell. *See, e.g.*, *State v. Pippen*, 4th Dist. No. 11CA3412, 2012-Ohio-4692, 2012 WL 4789846, ¶ 36 (given sheer quantity of Oxycodone recovered, as well as other evidence including cash recovered from home, it was reasonable for jury to find defendant intended to sell or resell the Oxycodone). Accordingly, a rational trier of fact could have found the elements of aggravated funding of drug trafficking proven beyond a reasonable doubt.

Appellant's challenge regarding his conviction for engaging in a pattern of corrupt activity is predicated upon his claim that the evidence was insufficient to support his convictions for aggravated funding of drug trafficking. As indicated above, however, the evidence was sufficient to support those convictions, and we further find that appellant's conviction for engaging in a pattern of corrupt activity was supported by sufficient evidence.

Based upon the foregoing, appellant's first assignment of error is overruled.

*Johnson*, 40 N.E.3d at 643–47.

<u>Funding Trafficking</u>.  Petitioner argues that the State used the wrong statute to prosecute him.  Petitioner's argument has several steps.  First, citing to *State v. Scott*, 69 Ohio St.2d 439 (1982) (superseded by statute as stated in *State v. Chandler*, 109 Ohio St.3d 223 (2006)), he contends that the Ohio statute regarding the funding of drug trafficking criminalizes the financing of another for the purpose of selling or offering to sell controlled substances. Petitioner next explains that he was not prosecuted on a theory that he passively financed the drug trafficking business of a third-party but on the theory that he recruited individuals to obtain oxycodone that he could then market on his own.  In Petitioner's view, this conduct, if proven, would constitute the crime of complicity to possess drugs under Ohio Revised Code §2923.03(A)(1) and 2925.11(A).  Thus, Petitioner argues that this case is like *State v. Bowshier*, No. 83-01-004, 1983 WL 4471 (Ohio App. Sept. 7, 1983), a state appellate opinion which he explains affirmed the dismissal of a funding charge under a theory similar to the one used to prosecute him.  Finally, Petitioner claims that because *Scott* was the only Ohio Supreme Court

case controlling at the time of his alleged conduct and *Bowshier* was the only lower appellate court decision applying *Scott*, the state appellate court erred by not relying on *Bowshier*.

Petitioner's argument has several flaws. First, *Bowshier* and *Scott* interpreted a different statutory section than that used to convict Petitioner and have no bearing here. Even more important, "a state court's interpretation of state law, including one announced on direct appeal of the challenged conviction, binds a federal court sitting in habeas corpus." *Bradshaw v. Richey*, 546 U.S. 74 (2005). In this case, the state appellate court determined that, as a matter of state law, under the funding statute applicable here, Ohio Rev. Code § 2925.05, the recipient of money is not required to both obtain the controlled substance and sell or offer to sell it. Rather, it is necessary only for the recipient of the money to obtain the controlled substance for future resale. Other Ohio appellate courts have reached the same conclusion. *See State v. Turner*, No. E-95-056, 1997 WL 543073 (Ohio App. Aug. 29, 1997); *State v. Caudill*, No. 05-97-35, 1998 WL 833729 (Ohio App. Dec. 2, 1998). That interpretation binds the federal habeas court. *Bradshaw, supra*; *see also Allen v. Morris*, 845 F.2d 610, 614 (6th Cir. 1988) (noting that a habeas court does not function as an additional state appellate court reviewing state court decisions on state law).

Moreover, as the state appellate court recognized by way of a footnote, even accepting Petitioner's interpretation of the statute, various witnesses testified to their roles in selling the controlled substances. For example, Terry Maxwell testified that in the spring of 2010, Petitioner approached him about traveling to Florida after fronting Mr. Maxwell pills to sell and that, eventually, Petitioner started sending the drugs to West Virginia to be sold. T. 399, 410. Further, Frances Smith testified that sometime in July, 2010, she started taking monthly trips to Florida financed by Petitioner and that she both sold and used the pills she obtained. T. 499512.

Additionally, Eric MacDonald testified that he was asked by Petitioner to start taking trips to Florida to get some pills and start making money, that he took 80 to 100 trips over roughly two years, that Petitioner gave him money for these trips, and that he either sold or used the pills he kept. T. 254–56, 257, 261, 267. Petitioner's bare argument that this testimony was only general in nature and not tied to any specific funding count is not persuasive.

Controlled Substance. Petitioner also argues that the State failed to present testimony from a lab analyst that the pills at issue were Schedule II controlled substances. To the extent that the Tenth District upheld the use of lay witness testimony to identify the substances, Petitioner argues, relying on *State v. McKee*, 91 Ohio St.3d 292 (2001), that the prosecution must also demonstrate that the witness used the substance at issue. Further, Petitioner contends that under *McKee*, the State was required to correlate the lay opinion testimony with the specific drug count under consideration.

Petitioner's argument on this issue also is unavailing. First, as Petitioner's argument recognizes, the State was not required to provide testimony from a lab analyst regarding whether the pills were controlled substances. Further, Petitioner overreads *McKee* to the extent that he suggests the lay witnesses were required to use the substances at issue in order for their testimony to be considered. Further, beyond lay testimony, the State presented prescription records, receipts, and Oxycodone pills recovered during police searches. All of this evidence, viewed in the light most favorable to the prosecution, was sufficient to establish the identity of the controlled substance and to allow a rational trier of fact to convict as required under *Jackson*.

Bulk Amount of the Drugs. Petitioner further argues that the State failed to prove the specific intent to sell or offer to sell more than the bulk amount of the drugs. In particular, Petitioner argues that the testimony of two witnesses, Richard Muncy and Terry Maxwell, failed

to specify the quantity of pills and did not connect any purchases of pills to a particular drug trip charged in the indictment. According to Petitioner, although Robert Sparks testified regarding a transaction exceeding the bulk amount, his alleged purchases were not tied to a particular funding count. Petitioner contends, without authority, that the state appellate court's failure to link testimony to a particular transaction is inconsistent with the principle requiring guilt to be evaluated with respect to the "evidence applicable to each count separately." *Traverse*, Doc. 16, PAGEID# 1800, quoting Ohio Jury Instructions – Criminal, §425.07(3).

More to the point, there is sufficient evidence of the specific intent to resell or offer for resale more than the bulk amount of drugs. As the state appellate court noted, "[t]he state presented testimony . . . as to the quantity of drugs obtained by co-defendants during the nearly two-year period. The state also introduced exhibits including a chart listing the prescriptions for Oxycodone 30 milligram pills obtained by the various individuals, as well as individual pharmacy patient history records." *Johnson*, 40 N.E.3d at 647. In addition, "the individuals traveling to Florida obtained approximately 46,000 Oxycodone 30 milligram pills, and that the street value of the drugs obtained was $920,000. Further, the state presented other circumstantial evidence, including items recovered from appellant's residence, evincing an intent by appellant to sell or resell." *Id.* Applying the deference this Court must, *see Brown*, 567 F.3d at 205, the Court cannot conclude that the state appellate court's conclusion is unreasonable.

Pattern of Corrupt Activity. Plaintiff contends that if this Court agrees that the funding counts are not supported by sufficient evidence, then the Court must conclude that the State failed to prove a pattern of corrupt activity required to support his conviction on Count 1. Because the Court did not so hold, it will not consider this sub-claim.

In summary, with respect to the various sub-claims set forth in Ground Two, Petitioner has not demonstrated that the state appellate court unreasonably applied United States Supreme Court precedent or unreasonably determined the facts of record.

### C. Ground Three: Denial of Rights to Confrontation and a Fair Trial

In his Petition, Petitioner's third ground for relief is that "Restrictions on cross-examination, erroneous evidentiary rulings, and defective jury instructions deprived Petitioner of his Sixth and Fourteenth Amendment right[s] to due process and a fair trial." *Petition*, Doc. 1, PAGEID# 8. In his Traverse, however, Petitioner revised his third claim for relief to state only that "[t]he trial court's restriction on the cross-examination of the lead investigator deprived petitioner of his Sixth and Fourteenth Amendment right[s] of confrontation and a fair trial." *Traverse*, Doc. 16, PAGEID# 1801. Respondent asserts that, on direct appeal, Petitioner raised this claim only as a cumulative error claim and that, to the extent that he is attempting to raise it as an individual claim now, it is procedurally defaulted.

To counter Respondent's assertion of procedural default, Petitioner argues, by way of a footnote, that he raised the Sixth Amendment claim on direct appeal, albeit under a separate heading. According to Petitioner, the state appellate court addressed and decided the claim separately from the other claims contained in his third assignment of error. Consequently, Petitioner contends, the state court had a meaningful opportunity to resolve this constitutional claim prior to federal review.

A review of Petitioner's appellate briefs confirms that Petitioner raised this claim as a sub-issue within his cumulative error claim set forth in his third assignment of error but did not raise it as a distinct claim. *See Return of Writ*, Doc. 6-1, PAGEID# 427–28. Further, although the state appellate court addressed this sub-issue within the context of his cumulative error claim,

the court addressed it only in terms of state law, applying an abuse of discretion standard. *Johnson*, 40 N.E.3d at 652–53.

Consequently, this claim is procedurally defaulted. The failure to have included this claim as an assignment of error on direct appeal is a procedural default. *See, e.g.*, *Hess v. Eberlin*, No. 2:04-cv-1144, 2006 WL 1064056, *11 (S.D. Ohio Apr. 20, 2006) ("Petitioner's … claims are readily apparent from the face of the record and therefore should have been raised on direct appeal"). And as *Hess* and numerous other decisions from this Court have held, Ohio's rule that claims apparent on the face of the record must be raised on direct appeal is an "adequate and independent state ground[] for denying relief," and the application of res judicata as to such claims in any subsequent proceeding "is stated in unmistakable terms in numerous Ohio decisions and Ohio courts have consistently refused to review claims on the merits under that doctrine. *Id.*, citing *State v. Ishmail*, 67 Ohio St.2d 16, 423 N.E.2d 1068 (1981); *State v. Perry*, 10 Ohio St.2d 175, 226 N.E.2d 104 (1967). Moreover, Petitioner has not argued any cause or prejudice to excuse the default. *See, e.g.*, *Murray v. Carrier*, 447 U.S. 478, 485 (1986). Petitioner has not raised such a claim here. Consequently, Petitioner's claim is procedurally defaulted.

Moreover, even if this claim were not procedurally defaulted, it would fail because such a claim is non-cognizable in habeas. Generally, "alleged errors in evidentiary rulings by state courts are not cognizable in federal habeas review." *Moreland v. Bradshaw*, 699 F.3d 908, 923 (6th Cir. 2012) (citing *Collier v. Lafler*, 419 F. App'x 555, 558 (6th Cir. 2011)). However, a federal court may grant relief when "'the state's evidentiary ruling is so fundamentally unfair that it rises to the level of a due-process violation.'" *Id.* Infractions that violate the "'fundamental fairness of a trial'" are a "'very narrow[]'" category. *Montanez v. Lazaroff*, No.

1:16 CV 258, 2017 WL 3037500, *8 (N.D. Ohio May 31, 2017) (quoting *Bey v. Bagley*, 500 F.3d 514, 522 (6th Cir. 2007)). "[S]uch violations are restricted to offenses against 'principle of justice so rooted in the traditions and conscience of our people as to be ranked as fundamental.'" *Id*. A petitioner "bears the burden of showing a violation of a principle of fundamental fairness." *Id*. Here, Petitioner has not argued, let alone demonstrated, that the trial court's evidentiary rulings limiting cross-examination of this witness resulted in fundamental unfairness rising to the level of a due process violation.

### D. Ground Four: Ineffective Assistance of Counsel

Petitioner's fourth ground for relief is that his trial counsel was ineffective in violation of the Sixth and Fourteenth Amendments. Respondent contends that this claim is without merit. The Court agrees with Respondent.

"In all criminal prosecutions," the Sixth Amendment affords "the accused . . . the right . . . to Assistance of Counsel for his defence." U.S. Const. amend. VI. "Only a right to 'effective assistance of counsel' serves the guarantee." *Couch v. Booker*, 632 F.3d 241, 245 (6th Cir. 2011) (citation omitted). The United States Supreme Court set forth the legal principals governing claims of ineffective assistance of counsel in *Strickland v. Washington*, 466 U.S. 556 (1984). *Strickland* requires a petitioner claiming ineffective assistance of counsel to demonstrate that his counsel's performance was deficient and that he suffered prejudice as a result. 466 U.S. at 687; *Hale v. Davis*, 512 F. App'x 516, 520 (6th Cir. 2013). A petitioner "show[s] deficient performance by counsel by demonstrating 'that counsel's representation fell below and objective standard of reasonableness.'" *Poole v. MacLaren*, No. 12–1705, 2013 WL 6284355, at *5 (6th Cir. Dec. 5, 2013) (quoting *Davis v. Lafler*, 658 F.3d 525, 536 (6th Cir. 2011) (internal quotation marks omitted) and citing *Strickland*, 466 U.S. at 687). To make such a showing, a petitioner

"must overcome the 'strong [ ] presum[ption]' that his counsel 'rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment.'" *Id.* (quoting *Strickland*, 466 U.S. at 687). "To avoid the warping effects of hindsight, [courts must] 'indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance.'" *Bigelow v. Haviland*, 576 F.3d 284, 287 (6th Cir. 2009) (quoting *Strickland*, 466 U.S. at 689).

The United States Supreme Court has cautioned federal habeas courts to "guard against the danger of equating unreasonableness under *Strickland* with unreasonableness under § 2254(d)." *Harrington v. Richter*, 562 U.S. 86, 105 (2011). The Court observed that while "'[s]urmounting *Strickland*'s high bar is never . . . easy' . . . [e]stablishing that a state court's application of *Strickland* was unreasonable under § 2254(d) is even more difficult." *Id.* (quoting *Padilla v. Kentucky*, 559 U.S. 356, 371 (2010) and citing *Strickland*, 466 U.S. at 689). The Court instructed that the standards created under *Strickland* and § 2254(d) are both "'highly deferential,' and when the two apply in tandem, review is 'doubly' so." *Id.* (citations omitted). Thus, when a federal habeas court reviews a state court's determination regarding an ineffective assistance of counsel claim, "[t]he question is not whether counsel's actions were reasonable. The question is whether there is any reasonable argument that counsel satisfied *Strickland*'s deferential standard." *Id.*

Petitioner first contends that his trial counsel was ineffective for failing to object to improper questioning or prejudicial cross-examination of a number of witnesses including Detective David Allen, Robert Muncy, Eric McDonald, Carter Moore, Stephen Anderson, Terry Maxwell, Robert Sparks, Jason Moore, Frances Smith, Richard Muncy, Christina Perry, and

Jeremy Ehrenborg.  The state appellate court addressed this portion of Petitioner's ineffective assistance claim on the merits:

> Under the fourth assignment of error, appellant raises a claim of ineffective assistance of counsel. Specifically, appellant argues that his trial counsel was deficient in failing to: (1) object to improper questioning, including leading questions, (2) move for a mistrial, (3) conduct an adequate legal investigation, and (4) object to jury instructions.
>
> The Supreme Court of Ohio has adopted the two-part test set forth in *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984), for ineffective assistance of counsel. *See State v. Bradley*, 42 Ohio St.3d 136, 142, 538 N.E.2d 373 (1989). Under this test, "[c]ounsel's performance will not be deemed ineffective unless and until counsel's performance is proved to have fallen below an objective standard of reasonable representation and, in addition, prejudice arises from counsel's performance." *Id*. at paragraph two of the syllabus. In order to show prejudice, "the defendant must prove that there exists a reasonable probability that, were it not for counsel's errors, the result of the trial would have been different." *Id*. at paragraph three of the syllabus.
>
> Appellant first contends that counsel was ineffective for failing to object to testimony by Detective Allen regarding observations reported to him by law enforcement personnel in other jurisdictions. Specifically, appellant argues that counsel should have objected to testimony by the detective regarding contacts made with law enforcement personnel in Florida and Virginia, including surveillance conducted by officers in those jurisdictions with respect to Robert, Richard, Kelley, and Smith. Even assuming counsel should have objected to this testimony, appellant has not demonstrated prejudice as such evidence was cumulative of other properly admitted evidence. As previously noted, the above co-defendants all testified as to their activities in Florida and Virginia, *i.e.*, that they obtained prescriptions from pain clinics in Florida and filled prescriptions either in Florida or Virginia. As such, appellant cannot demonstrate that the outcome of the trial would have been different but for counsel's failure to object.
>
> Appellant also challenges trial counsel's handling of the testimony of various co-defendants, including Robert, MacDonald, Carter, Anderson, Maxwell, Sparks, Jason, Smith, Richard, and Perry. Specifically, appellant maintains that counsel failed to object to leading questions and/or was deficient in handling the cross-examination of these witnesses.
>
> With respect to the testimony of Robert, appellant contends that Robert lacked personal knowledge of the source of funding for his drug trips. According to appellant, trial counsel was deficient in failing to object to the prosecutor's use of leading questions to imply Robert had such personal knowledge. Robert, however, testified that appellant approached him about taking trips to Florida and

that he had an agreement with appellant in which appellant offered to pay for his expenses related to those trips. We also note that defense counsel objected during direct examination to the state's inquiry of Robert as to who funded his first trip, citing a lack of foundation. The trial court sustained that objection, leading the prosecutor to rephrase the question.

Here, appellant cannot show deficient performance. Further, as reflected in the record, counsel made objections, resulting in the prosecutor rephrasing the question. *See, e.g.*, *State v. Sayre*, 3d Dist. No. 9–12–25, 2013-Ohio-4108, 2013 WL 5347361, ¶ 56 (where "[a]ll the objection would have done would be to cause the State to rephrase the question * * * there is no reason to believe that the objections would have affected the outcome of the case").

Appellant also contends counsel was ineffective in failing to object to various instances in which the prosecutor asked leading questions of other co-defendants, including Carter, Sparks, Smith, and Perry. Pursuant to Evid. R. 611(C), "[l]eading questions should not be used on the direct examination of a witness except as may be necessary to develop the witness' testimony." The "broad exception" under this rule "places the decision of whether to allow leading questions within the sound discretion of the trial court." *State v. Jefferson*, 2d Dist. No. 2002 CA 26, 2002-Ohio-6377, 2002 WL 31647807, ¶ 9. As such, "the Ohio Supreme Court has held that the failure to object to leading questions does not constitute ineffective assistance of counsel." *Id.*, citing *State v. Jackson*, 92 Ohio St.3d 436, 449, 751 N.E.2d 946 (2001). This is so "because the failure of counsel to object may have been the result of trial strategy." *Id.* In a similar vein, "[t]he scope of cross-examination falls within the ambit of trial strategy, and debatable trial tactics do not establish ineffective assistance of counsel." *State v. Conway*, 109 Ohio St.3d 412, 2006-Ohio-2815, 848 N.E.2d 810, ¶ 101.

Based upon this court's review of the record, appellant has failed to demonstrate how he was prejudiced by trial counsel's failure to object to the state's use of leading questions. To the extent appellant contends that some of the leading questions elicited inadmissible hearsay, we have previously held that the state laid a proper foundation such that the challenged statements constituted declarations by co-conspirators, and were, therefore, admissible as non-hearsay under Evid. R. 801(D)(2).

Appellant contends that counsel should have objected to the state's use of a spreadsheet to "steer" MacDonald into agreeing with the state that appellant funded 22 particular drug trips. MacDonald testified, however, without utilization of the spreadsheet, that he took approximately 80 trips to Florida. He further testified that, with the exception of the first trip, appellant funded each one of those trips. While appellant contends that the state failed to lay a proper foundation under either Evid.R. 612 or 803(5) to utilize the spreadsheet, there is nothing to indicate the state would not have been able to lay such a foundation for this evidence.

Appellant also contends that the prosecutor asked leading questions of Anderson without developing any foundation for personal knowledge. During direct examination, Anderson testified that appellant was "funding * * * activity for me down in Florida." (Tr. 359.) The record indicates that, during cross-examination, defense counsel elicited from the witness that his knowledge of appellant's activities was limited to what others told him as opposed to what he had observed. Counsel's decision to cross-examine the witness about his knowledge of funding rather than object to a leading question does not demonstrate deficient performance.

*Johnson*, 40 N.E.3d at 655–57.

Now, in this matter, Petitioner contends that the state appellate court afforded only superficial treatment to counsel's various deficiencies as outlined below and should have considered their aggregate prejudicial effect instead of characterizing them as merely tactical. Petitioner explains, citing to both *Lundgren v. Mitchell*, 440 F.2d 754, 774 (6th Cir. 2006) and *White v. McAninch*, 235 F.3d 988 (6th Cir. 2000), that a demonstrated, consistent pattern of failing to object to improper questions or affirmatively eliciting damaging testimony on cross-examination, deprives a defendant to the right to effective assistance of counsel. Petitioner details numerous deficiencies in an effort to establish such a pattern. Here is a summary:

Detective David Allen. This witness testified about observations made by law enforcement personnel in other jurisdictions who did not testify and whose statements were not otherwise recognized as a hearsay exception.

Robert Muncy. Mr. Muncy had no personal knowledge of the source of his drug trip funding and the prosecutor used leading questions to support the State's version of events about which this witness had either no recollection or personal knowledge.

Eric McDonald and Richard Muncy. Petitioner contends that there were several problems with Eric McDonald's testimony including that he that he lacked specific recollection of his 80 to 100 drug trips and the prosecutor used a spreadsheet as an aid to elicit this witness'

agreement that Petitioner had financed these trips; the spreadsheet was used without a proper foundation having been laid; and in cross-examination defense counsel elicited further damaging testimony against Petitioner, including testimony that reinforced the prosecution's theory of this witness' truthfulness about funding and that this witness kept Petitioner informed of his drug deliveries. Petitioner makes similar allegations regarding Richard Muncy's testimony as it pertained to the lack of recollection of individual trips and the prosecutor's use of a spreadsheet.

Carter Moore. Defense counsel both failed to object to leading questions of this witness and compounded this error on cross-examination by suggesting Petitioner's offers for the witness to take multiple drug trips.

Stephen Anderson. Defense counsel both failed to object to the prosecutor's use of leading questions and a spreadsheet to elicit testimony against him and that in cross-examining Mr. Anderson, defense counsel assumed the truthfulness of his testimony.

Terry Maxwell. Defense counsel asked questions in a way that suggested the defense was conceding the truthfulness of his earlier testimony.

Robert Sparks. Defense counsel failed to object to leading questions suggesting the witness was lying to protect Petitioner and to object to hearsay statements.

Jason Moore. The prosecutor elicited testimony that Mr. Moore's fiancée had died in a car accident on a trip allegedly financed by Petitioner and because of the potential emotional impact of this irrelevant testimony, defense counsel had the duty to object.

Frances Smith. Defense counsel failed to object to leading questions and inadmissible hearsay.

<u>Christina Perry</u>.   The prosecutor used leading questions to elicit several items of inadmissible hearsay from Christina Perry and, although defense counsel offered a sustained objection, he did not request that the testimony be stricken or that a curative instruction be given.

<u>Jeremy Ehrenborg</u>.   The prosecutor elicited overview testimony from this detective regarding his investigation, a practice uniformly condemned by federal courts.

The state appellate court considered Petitioner's claims of ineffective assistance relating to the failure to object and the framing of questions on cross-examination.  The court noted that sometimes, rather than object, counsel addressed the issue on cross-examination or sometimes, when counsel did object to leading questions, the prosecutors simply rephrased the questions. With respect to the claim that counsel failed to object to hearsay, the court explained that the testimony at issue fell within an exception.  As for the issue of the scope of cross-examination, the state appellate court determined that it constituted trial strategy.  The Court understands that Petitioner is now arguing that the numerous examples of his counsel's decisions regarding objections and cross-examination prevent counsel's actions from being viewed as merely tactical and requires that they be viewed, on the whole, as ineffective assistance.  But even viewed through that lens, the Court concludes that the state court did not unreasonably find that counsel's performance was within the bounds of reason.

Additionally, even if the Court were inclined to find deficient performance (which it is not), Petitioner would still have to satisfy *Strickland*'s prejudice prong.  The state appellate court expressly found that Petitioner has failed to demonstrate prejudice under *Strickland*.  To meet the prejudice prong of *Strickland*, a Petitioner must demonstrate "a reasonable probability that, but for counsel's unprofessional errors, the result to the proceeding would have been different." *Buck v. Davis*, --U.S. --, 137 S.Ct. 759, 765 (2017) (quoting *Strickland*, 466 U.S. at 694).

The extent of Petitioner's prejudice argument is as follows:

> The errors and omissions of counsel, identified above, aided the State in overcoming the glaring holes in its case. If timely objections were lodged, the witnesses would have been forced to testify from their own memories and personal knowledge, instead of hearsay and the scripted version of the prosecution. Johnson's trial would not have been tainted by testimony regarding the fatality. The dubious credibility of the witnesses would not have been enhanced by the "overview" testimony of the detective.

*Traverse*, Doc. 16, PAGEID# 1812.

Petitioner's argument is merely conclusory. Petitioner does not explain with any specificity the ways in which he suffered prejudice related to these alleged deficiencies of counsel. This portion of Petitioner's ineffective assistance of counsel claim therefore fails.

Petitioner further contends that defense counsel was ineffective for failing to move for a mistrial following the CI's testimony. In connection with this claim, Petitioner again asserts that the CI's testimony demonstrated that the State had misrepresented his expected testimony as a means for Mr. Armengau's disqualification. The state appellate court addressed the issue in this way:

> Appellant contends defense counsel was deficient in failing to move for a mistrial following the testimony of the CI based upon his claim, previously addressed under the second assignment of error, that the state manufactured a sham conflict of interest in order to disqualify attorney Armengau. Having rejected appellant's claim that the state acted improperly in filing the motion to disqualify, appellant cannot demonstrate prejudice by counsel's failure to move for a mistrial.
> ....

*Johnson*, 40 N.E.3d at 657.

As discussed above, the Court concluded that Petitioner has not established that the prosecutors acted improperly in seeking to disqualify Mr. Armengau. Because the underlying claim lacks merit, Petitioner cannot demonstrate prejudice under *Strickland* and this portion of his ineffective counsel claim fails on its merits.

Finally, Petitioner argues that defense counsel was ineffective for failing to object to defective jury instructions. The state appellate court rejected this claim:

> Finally, appellant argues that his counsel was deficient in failing to object to the trial court's jury instruction as it relates to the offense of funding of drug trafficking. In addressing appellant's third assignment of error, we found that the instruction, read as a whole, stated the applicable law, and that appellant had not demonstrated error as a result of the trial court's failure to provide a verbatim recitation of the standard jury instructions. Accordingly, appellant cannot demonstrate prejudice as a result of trial counsel's failure to object to the instruction at issue.
>
> Based upon this court's review of the record, appellant has failed to show that his trial counsel's purported deficiencies, either individually or cumulatively, affected the outcome of his trial. Accordingly, appellant's fourth assignment of error is not well-taken and is overruled.

*Id.*

In reviewing this portion of Petitioner's claim on the merits, the state appellate court noted that, in addressing Petitioner's previous assignment of error, it concluded that the trial court's jury instruction was not in error. As a result, Petitioner was unable to demonstrate prejudice arising from counsel's failure to object. Here, Petitioner does not challenge the decision that the jury instruction was not in error. Consequently, Petitioner cannot establish that he was prejudiced by counsel's failure to object to the instruction and this claim fails on its merits.

In light of the above, the decision of the state appellate court rejecting Petitioner's claim of ineffective assistance of counsel was not contrary to nor an unreasonable application of Supreme Court precedent. Consequently, the Court recommends that this claim be dismissed.

### E. Ground Five: Constitutionality of Sentence

Petitioner's fifth ground for relief is that the imposition of an enhanced sentence as punishment for his decision to go to trial deprived him of his Sixth and Fourteenth Amendment

rights to due process and a jury trial. Before the state appellate court, Petitioner asserted that his consecutive prison sentence totaling 64 years was clearly and convincingly contrary to law or an abuse of discretion. Respondent argues that, to the extent Petitioner presents a state law claim, it is non-cognizable and that the state court's interpretation of state sentencing laws are binding on this Court. Beyond this, Respondent contends that any federal constitutional claim is procedurally defaulted because Petitioner did not fairly present the claim he raises in his petition. Finally, Respondent asserts that this ground for relief fails on the merits.

The Court first addresses the issue of fair presentment. In his Traverse, Petitioner explains that he fairly presented this constitutional claim to the state appellate court because he cited Ohio appellate decisions vacating sentences on grounds that the defendant was punished for exercising the constitutional right to a jury trial. In particular, Petitioner notes that he cited to *State v. Morris*, 159 Ohio App.3d 775 (Ohio App. 2005) and *State v. Howard*, No. 2012CA61, 2013 WL 4781932 (Ohio App. July 2, 2013), in his appellate briefs. These cases in fact address the issue of punishment for exercising the right to a jury trial. Further, in addressing Petitioner's claim, the state appellate court discussed *Howard*, and in rejecting the claim, stated specifically that "the record does not reflect that the trial court impermissibly punished appellant for exercising his right to trial." *Johnson*, 40 N.E.3d at 659. Under this circumstance, the state appellate court had the opportunity to remedy the asserted constitutional violations asserted here sufficient to satisfy the requirement of fair presentment. Consequently, the Court concludes that Petitioner fairly presented this claim to the state court.

Turning to the merits of Petitioner's claim, a defendant may not be punished for exercising the Sixth Amendment right to a jury trial. *United States v. Jackson*, 390 U.S. 570, 581 (1968). Further, a sentence is constitutionally vindictive if it imposes a greater punishment

because the defendant exercised a constitutional right, such as the right to a jury trial. *Williams v. Jones*, 231 F. Supp. 2d 586, 598 (citing *North Carolina v. Pearce*, 395 U.S. 711, 726 (1969)). Indeed, "'[i]t is improper for a[] judge to penalize a defendant for exercising his constitutional right to plead not guilty and go to trial, no matter how overwhelming the evidence of his guilt.'" *Id.* (quoting *United States v. Derrick*, 519 F.2d 1, 3 (6th Cir. 1975)).

Petitioner's argument here is that, prior to *voir dire*, the State offered him a 20-year prison term as part of a plea bargain. After this proposed sentence was reported to the trial judge, the court stated, "there's probably plenty of room for negotiations, but let's not let the trial get too deep in before those discussions start to take place." (T. Pre Voir Dire 3). Petitioner further explains that, following the trial but prior to announcing the sentence, the trial judge stated: "The sentence should not be disproportionate. And what I mean by this is just because you can give an effective life sentence, as has been done, not in my courtroom but in this courthouse of 100, 200 years, that doesn't make it appropriate." (T. Vol. IV 997). The trial judge ultimately sentenced Petitioner to a 64-year sentence.

In addressing Petitioner's claim, the state appellate court characterized it in the following way:

> Under the fifth assignment of error, appellant argues that the trial court's consecutive prison sentence totaling 64 years is clearly and convincingly contrary to law and/or an abuse of discretion. More specifically, appellant argues that the trial court penalized him for exercising his right to trial, and further erred by imposing, in effect, a life term.

*Johnson*, 40 N.E.3d at 657. The Court of Appeals proceeded to analyze Petitioner's claim as follows:

> In *State v. Murphy*, 10th Dist. No. 12AP–952, 2013-Ohio-5599, 2013 WL 6726913, ¶ 12, this court discussed the felony sentencing standard of review as follows:

> "We review a trial court's sentence to determine if it is clearly and convincingly contrary to law." *State v. Green*, 10th Dist. No. 10AP–934, 2011-Ohio-6451 [2011 WL 6294484], ¶ 7, citing *State v. Burton*, 10th Dist. No. 06AP–690, 2007-Ohio-1941 [2007 WL 1196579], ¶ 19; R.C. 2953.08(G). In applying this standard, we look to the record to determine whether the sentencing court considered and properly applied the non-excised statutory guidelines and whether the sentence is otherwise contrary to law. *Id*., citing *State v. Carse*, 10th Dist. No. 09AP–932, 2010-Ohio-4513 [2010 WL 3722763], ¶ 60; *Burton*. We are also cognizant of the two-step standard of review set forth by a plurality of the Supreme Court of Ohio in *State v. Kalish*, 120 Ohio St.3d 23, 2008-Ohio-4912 [896 N.E.2d 124], which asks (1) whether the trial court adhered to all applicable rules and statutes in imposing the sentence, and (2) whether a sentence within the permissible statutory range constitutes an abuse of discretion.

Appellant first points to comments made by the trial court pre-voir dire, during a colloquy with appellant regarding the state's offer of a plea bargain. Appellant notes that the pre-voir dire transcript indicates the state offered appellant a 20–year plea bargain. Appellant argues that, during that exchange, the trial court discussed two "similarly situated" defendants. (Pre–Voir Dire Proceeding, 3.)

Although the pre-voir dire transcript is brief, the record indicates that the state indicated it had "offered 20 years ODRC," and that appellant had "rejected the 20–year offer." (Pre–Voir Dire Proceeding, 2.) In addressing this issue, the trial court made the following remarks on the record:

> THE COURT: Well, and I don't know what's going to happen. I believe it sincerely, you're innocent unless otherwise proven guilty. I'm sure the discussions as to what sentence I gave to an individual similarly situated, and I could have gotten a lot higher than that. I think a lot of my colleagues would have.

> But obviously a sentence you give following a trial is frequently different than ahead of time because there's more charges that end up being there. So that's the real reason for that. It wasn't a rent for going to trial. It was simply there were more charges. I think in fairness I wanted to make sure you were aware of that sentence as well.

> If the two of you at any time want to start moving a little bit, and I think there's probably plenty of room for negotiations, but let's not let the trial get too deep in before those discussions start to take place.

(Pre–Voir Dire Proceeding, 3.)

According to appellant, the above comments are similar to those made by the trial court in *State v. Howard*, 5th Dist. No. 2012–CA–00061, 2013-Ohio-1972, 2013 WL 2106853, ¶ 85, in which that court held that comments by the trial court "created the appearance that it would punish [the defendant] more severely for exercising his right to a jury trial." In *Howard*, the reviewing court was concerned by statements by the trial court that, "even if [the defendant] were to agree to plead on the day of trial he would receive a more severe penalty." *Id*. at ¶ 86.

In *State v. Mayle*, 7th Dist. No. 04 CA 808, 2005-Ohio-1346, 2005 WL 678579, 45–46, the court noted:

> A defendant should never be punished for exercising his right to trial or refusing to enter into a plea agreement. * * * Such a punishment would impair the constitutional right to a trial by creating a chilling effect upon a defendant's ability to exercise his constitutional right. * * * Accordingly, a trial court may not augment a sentence because a defendant chooses to force the government to prove his guilt, "'no matter how overwhelming the evidence of [defendant's] guilt.'"
>
> But there are legitimate reasons why a trial court may sentence a defendant more harshly after a trial on the merits than it may have after a guilty plea. First, the United States Supreme Court has recognized the propriety of offering lenient sentences in exchange for a guilty plea. * * * It is proper to offer a more lenient sentence in exchange for a guilty plea because a defendant's acknowledgement of guilt has shown a willingness to assume responsibility for his conduct and has taken the first step toward rehabilitation. * * * Second, a trial court knows more details about the facts of the case, the flavor of the event, and its impact upon the victims after a trial on the merits than it would after a guilty plea. * * * This "more real and accurate appraisal of the circumstances which brought the defendant to the bar of justice" will "almost inevitably * * * affect the judge's consideration of what penalty appears most appropriate." * * * Accordingly, the fact that the sentence imposed after trial is greater than the sentence the State offered to recommend in exchange for a guilty plea does not demonstrate that the trial court acted improperly.

In order to "determine vindictiveness, we look to see whether the record affirmatively shows retaliation as a result of the rejected plea bargain." *State v. Paul*, 8th Dist. No. 79596, 2002 WL 228848 (Feb. 14, 2002).

In the present case, the comments by the trial court do not raise the same concerns at issue in *Howard*. Under the facts of that case, the trial court made clear on the record that it "absolutely" agreed with the prosecutor's statement that the state's plea offer of 12 years was only valid prior to trial, and that the defendant would receive a greater sentence if he were to agree to plead on the day of trial. *Id.* at ¶ 84.

Here, the record does not reflect that the trial court impermissibly punished appellant for exercising his right to trial. During the sentencing hearing, the trial court cited the "purposes and principles of sentencing." (Tr. 996.) The court noted its agreement as to "the guidelines set forth that there must be a consideration for a minimum sentence," and that the sentence "must be commensurate and not demeaning with the seriousness of the crime." (Tr. 997.) The court further noted that a sentence "should not be disproportionate. And what I mean by this is just because you can give an effective life sentence * * * that doesn't make it appropriate." (Tr. 997.)

Regarding the trial testimony, the trial court cited the fact the enterprise did not operate based upon "single trips," but, rather, "[t]here were three or four individuals in the car every time," resulting in "the purchase and distribution of literally thousands of drugs." (Tr. 998.) On this point, the court observed: "I don't think the impact can be overstated, * * * we saw it with the people that were testifying what happens to their lives." (Tr. 998.)

The court next discussed the statutory seriousness and recidivism factors, stating in part: "As noted in the presentence report, the seriousness factor of organized activity was noted. None of the less serious factors were identified." (Tr. 999.) With respect to the recidivism factor, the court cited the fact that the presentence investigation report ("PSI") "points out that four of the six separate factors making recidivism likely were present." (Tr. 1000.) The court found that appellant has "done a terrible job on supervision for prior offenses. And he was on supervision when this offense occurred having just been placed on federal release supervision just months before this activity came." (Tr. 1000.) The trial court further cited the fact that appellant's "criminal history is extensive with prior prison terms, not only by the feds, by me granting judicial release only having to revoke it." (Tr. 1000.) The court also found "absolutely no remorse" on the part of appellant. (Tr. 1000.)

The trial court, citing appellant's "extensive prior record," and "the factors regarding seriousness and recidivism," determined that "consecutive sentences are necessary to both punish the offender and protect society." (Tr. 1001.) The court reiterated the fact that appellant "was under four years of federal supervision as of September '09 for a prior drug distribution when this all started," and that "each trip was not a single trip. There were multiple individuals buying multiple amounts of drugs at each one of those individual trips." (Tr. 1002.)

The trial court then discussed the range of sentences available, stating in part:

> If I just gave him the midrange, and on the felonies of the first degree, it's 3 to 11; 7 is spot in the middle. And I think given his record, the activity, the recidivism, all of that would easily support a midrange sentence and a consecutive sentence. But if I did the midrange alone, he's over 182 years. I don't think that's appropriate. Even if I gave him the minimum of 3, which is a struggle, on the funding alone, it's over 75 years. Again I have difficulty with that.
>
> But again given the nature of [the] crime and the activity and the defendant's record, there's just so much I can do. I have not been given a whole lot to work with.
> (Tr. 1002–03.)

Upon review, the record indicates that the trial court properly considered the statutory purposes and principles of sentence, as well as the seriousness and recidivism factors. In addition to imposing a seven-year sentence for the offense of engaging in a pattern of corrupt activity, the trial court imposed three-year sentences as to each of the aggravated funding of drug trafficking counts. The minimum term for a first-degree felony is three years. R.C. 2929.14(A)(1). While the trial court imposed consecutive sentences, the court noted on the record, after a consideration of the statutory factors and the PSI, the basis for the sentence imposed. Further, "[w]hen an accused rejects the offer of a plea bargain, elects to exercise the right to trial, and is found guilty, the court is not required to impose sentence within the parameters discussed in the rejected plea bargain." *Paul*. Upon review, the record does not support appellant's claim that the court's sentence was based on vindictiveness, nor is the sentence contrary to law.

Appellant also raises a proportionality argument, asserting that he has effectively received a life sentence given his current age. Appellant argues that the trial court, by ordering 19 of the 3–year prison terms for aggravated funding of drug trafficking to be served consecutively to each other, failed to incorporate the principle of incremental punishment as found in the federal sentencing guidelines.

In general, "a sentence that falls within the terms of a valid statute cannot amount to a cruel and unusual punishment." *McDougle v. Maxwell*, 1 Ohio St.2d 68, 69, 203 N.E.2d 334 (1964). The Supreme Court of Ohio has held that "proportionality review should focus on individual sentences rather than on the cumulative impact of multiple sentences imposed consecutively." *State v. Hairston*, 118 Ohio St.3d 289, 2008-Ohio-2338, 888 N.E.2d 1073, ¶ 20. Thus, "[w]here none of the individual sentences imposed on an offender are grossly disproportionate to their respective offenses, an aggregate prison term resulting from consecutive imposition of those sentences does not constitute cruel and unusual punishment." *Id*. Further, this court has noted that "[t]he more crimes an individual commits,

the more likely it is that the ultimate prison sentence will indeed be a lengthy one." *State v. Watkins*, 10th Dist. No. 13AP–133, 2013-Ohio-5544, 2013 WL 6708397, ¶ 19.

In the instant case, the trial court's sentence was within the statutory range. While appellant argues that his sentence would be less severe under the federal sentencing guidelines, we note that the federal guidelines "operate under a rigid system," and "differ markedly from the Ohio sentencing guidelines." *State v. Agner*, 3d Dist. No. 12000–04, 2000 WL 1061233 (Aug. 3, 2000). *See also State v. Blackley*, 8th Dist. No. 100574, 2014-Ohio-3140, 2014 WL 3537854, ¶ 15 ("Sentencing in Ohio is not accomplished according to a tightly controlled grid system similar to federal sentencing guidelines."). Upon review, we find unpersuasive appellant's contention that the trial court's sentence is arbitrary, unreasonable or unconscionable. Accordingly, appellant's fifth assignment of error is hereby overruled.

*Id*. at 657–61.

The state appellate court reasonably applied Supreme Court precedent. The most relevant precedent is *North Carolina v. Pearce*, 395 U.S. 711, 725 (1969), and its progeny. In *Pearce*, the Court explained that due process precludes vindictiveness from playing any role in a defendant's sentence following a remand. Under limited circumstances, a rebuttable presumption of vindictiveness exists when a defendant receives a more severe sentence when it occurs after remand. *Id*. Without the benefit of the *Pearce* presumption, however, a defendant must meet his burden of proving actual vindictiveness. *Wasman v. United States*, 468 U.S. 559, 569 (1984). And the Supreme Court made clear in *Alabama v. Smith*, 490 U.S. 794 (1989), "that no presumption of vindictiveness arises when the first sentence was based upon a guilty plea, and the second sentence follows a trial." *Id*. (quoting *Alabama*, 490 U.S. at 795).

Here, Petitioner was sentenced after conviction at trial after his decision to reject a plea bargain and plead not guilty. In this circumstance, no presumption of vindictiveness arises from the trial judge's imposed sentence, and Petitioner bears the burden that his sentence was motivated by actual judicial vindictiveness. *See Williams v. Jones*, 231 F. Supp. 2d at 598 (citing *Wasman v. United States*, 468 U.S. 559, 567–68 (1984)). Further, Petitioner has provided no

evidence of vindictiveness here. The trial judge's limited comments prior to sentencing cited by Petitioner are merely observations about the length of sentences handed down by fellow judges and provide no hint of vindictive intent. The mere imposition of a longer sentence on its own is insufficient to constitute vindictiveness or retaliation. *Id.* Moreover, the State is free to encourage guilty pleas by offering benefits to a defendant or by threatening more severe punishment for refusing a negotiated plea. *Williams v. Jones*, 231 F. Supp. 2d at 598 At the same time, a defendant is free to reject an offer and cannot complain "that the denial of the rejected offer constitutes a punishment or is presumptive evidence of judicial vindictiveness." *Id.*

Based on the current record, the Court cannot conclude that the state appellate court's decision was contrary to or an unreasonable application of Supreme Court precedent. Consequently, the Court will recommend the dismissal of this claim.

## IV. REMAINING ISSUE

The Court previously granted, on an interim basis, Petitioner's motion for leave to file under seal the affidavits of the CI and Mr. Armengau and a copy of the motion for evidentiary hearing filed in state court. *See Order*, Doc. 17. In granting the motion, the Court noted that the basis for the leave request was that the documents had been filed under seal in the state court proceedings. Citing, *inter alia*, the requirements of *Shane v. Blue Cross Blue Shield of Michigan*, 825 F.3d 299 (6th Cir. 2016), the Court directed the parties to brief the issue of maintaining these documents under seal. The parties have responded to the order.

Petitioner explains that he has no personal interest or stake in maintaining these documents under seal and only requested to file them in that manner out of "an abundance of

caution" to protect the identity of the CI.  Petitioner notes that the identity and the nature of his cooperation agreement are disclosed in the trial transcript which has never been sealed.

Respondent, on the other hand, opposes lifting the seal, citing the need to protect the safety and welfare of the CI.  Respondent has not addressed the issue of the disclosure of the CI's identity in the unsealed trial transcript nor sought to have particular portions of the transcript sealed.  The Court notes that, not only is the CI's identity set forth in the trial transcript, it appears multiple times in the Traverse.  Respondent has not requested the sealing of this document either.  If Respondent seeks to have these other documents sealed, Respondent shall file a brief directed to that issue within seven days.  The failure to do so will result in the Court's unsealing of the previously sealed documents on the eighth day.

## V.  RECOMMENDED DISPOSITION

For the reasons set forth above, the Magistrate Judge **RECOMMENDS** that the petition be **DENIED** and this action be **DISMISSED**.  Respondent shall file any brief directed to the issue of sealing within seven days of the date of this order.  The failure to do so will result in the unsealing of the previously sealed documents on the eighth day.

### Procedure on Objections

If any party objects to this Report and Recommendation, that party may, within fourteen (14) days of the date of this report, file and serve on all parties written objections to those specific proposed findings or recommendations to which objection is made, together with supporting authority for the objection(s).  A judge of this Court shall make a de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made. Upon proper objections, a judge of this Court may accept, reject, or modify, in whole or in part, the findings or recommendations made herein, may receive further

evidence or may recommit this matter to the magistrate judge with instructions. 28 U.S.C. § 636(b)(1).

The parties are specifically advised that failure to object to the Report and Recommendation will result in a waiver of the right to have the district judge review the Report and Recommendation de novo, and also operates as a waiver of the right to appeal the decision of the District Court adopting the Report and Recommendation. *See Thomas v. Arn*, 474 U.S. 140 (1985); *United States v. Walters*, 638 F.2d 947 (6th Cir.1981).

The parties are further advised that, if they intend to file an appeal of any adverse decision, they may submit arguments in any objections filed, regarding whether a certificate of appealability should issue.

IT IS SO ORDERED.

Date: January 11, 2018                              s/ Kimberly A. Jolson
                                                    KIMBERLY A. JOLSON
                                                    UNITED STATES MAGISTRATE JUDGE